158 N.J. Super. 368 (1978)
386 A.2d 405
LOUISE T. HARRISON, ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF WILLIAM B. HARRISON, DECEASED, PLAINTIFF-APPELLANT,
v.
MIDDLESEX WATER COMPANY AND TOWNSHIP OF CLARK, NEW JERSEY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued January 3, 1978.
Supplemental Memoranda Submitted February 21, 1978.
March 9, 1978.
Decided March 31, 1978.
*373 Before Judges FRITZ, BOTTER and ARD.
*374 Mr. William J. Gearty argued the cause for the appellant.
Mr. Robert T. Hueston argued the cause for the respondent Middlesex Water Company (Messrs. Hueston, Hueston and Sheehan, attorneys).
Mr. Michael John Stone argued the cause for the respondent Township of Clark (Messrs. Hoagland, Longo, Oropollo & Moran, attorneys).
The opinion of the court was delivered by ARD, J.A.D.
The deceased, plaintiff's husband, died in a heroic attempt to rescue two 15-year-old boys who had fallen through the ice while skating on a reservoir owned by Middlesex Water Company (water company) and located in the Township of Clark (township). At the close of plaintiff's case the trial judge granted the water company's motion for an involuntary dismissal (R. 4:37-2(b)) and the township's motion for judgment (R. 4:40-1). Plaintiff appeals both rulings.
The standard for determining a motion for judgment under R. 4:40-1 is the same as that governing the resolution of a motion for involuntary dismissal under R. 4:37-2 (b). In reviewing both motions the judge must accept as true all the evidence which supports the position of the party defending against the motion and must accord him the benefit of all legitimate inferences which can be deduced therefrom, and if reasonable minds could differ, the motion must be denied. Dolson v. Anastasia, 55 N.J. 2, 5 (1969).
With this test in mind, plaintiff's proofs establish the following: In 1907 the water company created a lake or reservoir by damming a small stream. Over the passage of years the surrounding area became built-up to such an extent that the 94 acres of water surface now sits in the midst of a largely residential area. The entire property owned by the water company is 136 acres, of which 94 acres consist of surface waters. It is bounded by a regional high school, *375 a ball field, a tennis court 60 to 80 feet from the water, an athletic field about the same distance from the water and another athletic field approximately 100 feet away. There are also private homes in the area, and some of the homes' rear lot lines are very near the water. There is no fence around the water's edge near the site of the tragic event. The area residents, including children, have made continual use of the reservoir over the years for ice skating. At times as many as 500 people were skating on the ice at the same time. On the day of the drowning a witness testified that there were "probably less than 100 people" on the ice. From this testimony it can be reasonably inferred that there were a sizable number of skaters on the ice at the time of the tragedy.
During the period 1959 to 1969 the water company hired special employees to patrol the reservoir, but that had been discontinued. At the time of the accident there were no regular patrols, although its employees would warn off trespassers as an incident to their other duties. The reservoir also had "no trespassing" signs placed around it. It can be inferred that the water company was aware of the use of the reservoir for ice skating.
The water company and its predecessor constructed the dam and built the reservoir for commercial purposes. A treatment plant and pumping station are located adjacent to the reservoir. Since 1969 the reservoir has been maintained by the water company as a standby system. The reservoir and facilities were used "in the event of failure of some of the other sources of supply or excessive demand that cannot be met from our other source at which time this plant would be operated." In prior years the police officers of the township were ordered by their superiors to check the reservoir and warn off anyone if the ice was dangerous for skating.
On February 6, 1972 plaintiff's decedent drowned while attempting to rescue two 15-year-old boys who had entered upon the reservoir, ice-skated and fell through the ice. One *376 of the boys drowned with decedent. On the date of the accident it was the first occasion of the winter season that portions of the reservoir's waters had frozen solid enough to permit ice-skating. Snow which had begun to fall earlier on the day in question covered the icy surface of the reservoir so that the thickness of the ice was not easily ascertained.
Before considering the claim with respect to each defendant, we note a general principle of law which applies to rescuers such as decedent in claims of this nature. A tortfeasor may be liable to a rescuer because of the negligence of the tortfeasor which caused the peril to the one rescued. Odar v. Chase Manhattan Bank, 138 N.J. Super. 464 (App. Div. 1976); Demetro v. Pennsylvania R.R. Co., 90 N.J. Super. 308 (App. Div. 1966); Cafone v. Spiniello Constr. Co., 42 N.J. Super. 590 (App. Div. 1956), certif. den. 23 N.J. 258 (1957). We therefore direct our inquiry to the duty owed the rescued boys by the defendants.
We first address ourselves to the question of the liability of the township. Plaintiff argues that there was evidence before the court from which a jury could reasonably infer that the police were negligent in patrolling the reservoir area after being ordered by their chief "to chase the children off the ice if in their opinion it looks unsafe." We disagree.
No evidence was adduced at trial suggesting what was done or not done by the local police on the day in question. Furthermore, it was never shown that the township had actual or constructive notice of the presence of skaters or the condition of the ice on the day in question. The record is barren of any activity or lack of activity by the township police. There was evidence that in prior years uniformed police would check the area from time to time and order children off the ice. There was also testimony that on February 6, 1972 there was ice thick enough for skating. The trial judge, in granting the motion for judgment in favor of the township, ruled:
*377 * * * [T]here is absolutely no evidence that on the day in question, the municipality that it patrols were there, that they saw any condition at all, whether or not it was dangerous or not and the Court has found previously that this is not a dangerous condition in terms of an artificial condition that applies to Middlesex. But having not seen it nor has there been any, there hasn't even been a scintilla of evidence that on the day in question, the police were there and that the only evidence was that at least a year ago, the defendant, Township of Clark, chased off Brian Sublisky on one day that this should give rise to tort liability upon the municipality for its failure on that day and the first day of skating to send someone over there to patrol the area, make observations and in finding a condition that was dangerous, to chase people off the ice. So, therefore, I grant a judgment in favor of the defendant, the Township of Clark. * * *
Essentially, plaintiff's claim against the township is that it failed to properly police and supervise private property, or if not having a duty to do so, had volunteered to do so. Plaintiff further claims that one of the boys who fell through the ice relied on the fact that there was no warning from the police on the day in question. However, plaintiff offered no evidence to indicate that the township's police were negligent in their patrol and observations of the condition of the ice. As plaintiff states in her brief:
At the posture in the case where the evidence ended, we do not know whether or not the police totally failed to obey these direct orders or whether they patrolled and failed to see if anyone was on the ice and were so careless in this patrol that they missed the 100 of them.
The basis of plaintiff's claim against the township is found in the testimony of Chief Anthony T. Smars of the Clark Township Police Department, given in pretrial depositions and admitted in evidence.
QUESTION: Do you have any standing police order concerning skating on the reservoir?
ANSWER: Our officers are advised that if they feel the ice is too thin and they are anywhere on the roadway, crossing over where the ice is on Raritan Road or Featherbed Lane, to use their loud-speakers to chase the children off the ice if in their opinion it look unsafe.
*378 Plaintiff simply has failed to prove, expressly or inferentially, a failure to comply with the aforementioned order. Furthermore, plaintiff has failed to prove that the boys' evaluation of the condition of the ice and their reliance thereon was based on the fact that the police did not chase them away.
In addition, plaintiff's cause of action occurred prior to July 1, 1972, the effective date of the New Jersey Tort Claims Act. N.J.S.A. 59:14-4. Accordingly, we are governed by prior decisional case law and not the aforementioned act. Maule v. Conduit & Foundation Corp., 124 N.J. Super. 488 (Law Div. 1973). Prior to the New Jersey Tort Claims Act, the liability of a municipality for negligence depended to a great extent upon whether the governmental function was proprietary or governmental. The municipality was only liable for injurious acts performed in its governmental capacity when they constituted active wrongdoing. Hartman v. Brigantine, 23 N.J. 530, 533 (1957). In McAndrew v. Mularchuk, 33 N.J. 172, 181 (1960), the court defined active wrongdoing as "when a person suffers an injury through a negligent act of commission, as distinguished from a negligent failure to act, an obligation to respond in damages is recognized." Unquestionably, the general function of policing and patrolling the municipality by the police department is a governmental function. However, plaintiff has failed to demonstrate any negligence on the part of the municipality which can be characterized as an act of commission. The record is simply barren of such proof. We therefore conclude that the trial judge's action with respect to the township was correct.
With respect to the water company, we are satisfied that the Landowner's Liability Act (act), N.J.S.A. 2A:42A-2 et seq., provides that the water company owes no duty to keep the premises safe from anyone using the premises for sport and recreational activity including skating.
N.J.S.A. 2A:42A-2 provides:
*379 As used in this act "sport and recreational activities" means and includes: hunting, fishing, trapping, horseback riding, training of dogs, hiking, camping, picnicking, swimming, skating, skiing, sledding, tobagganing and any other outdoor sport, game and recreational activity including practice and instruction in any thereof.
N.J.S.A. 2A:42A-3 specifically eliminates a duty of care to those engaged in the aforementioned recreational activities.
Except as provided in section 3 of this act:[1]
a. An owner, lessee or occupant of premises, whether or not posted as provided in section 23:7-7 of the Revised Statutes, owes no duty to keep the premises safe for entry or use by others for sport and recreational activities, or to give warning of any hazardous condition of the land or in connection with the use of any structure or by reason of any activity on such premises to persons entering for such purposes;
b. An owner, lessee or occupant of premises who gives permission to another to enter upon such premises for a sport or recreational activity or purpose does not thereby (1) extend any assurance that the premises are safe for such purpose, or (2) constitute the person to whom permission is granted an invitee to whom a duty of care is owed, or (3) assume responsibility for or incur liability for any injury to person or property caused by any act of persons to whom the permission is granted.
This statute's predecessor, N.J.S.A. 2A:42A-1 (repealed, L. 1968, c. 73, § 4 (1968)), was much narrower *380 in its scope of protection. It only protected the owners of woodlands and agricultural lands from liability from injuries incurred by persons while hunting or fishing on their property. Its successor, the statute in question, expanded the immune areas by changing the words "woodlands and agricultural lands" to the word "premises." In addition, the scope of activities was broadened to include all outdoor sports. Skating is one of the specified activities included in the definition of "sport and recreational activities." Moreover, we are satisfied that the broad acreage owned by the water company falls within the category of "premises."
In Magro v. Vineland, 148 N.J. Super. 34 (App. Div. 1977), a 14-year-old child was injured while diving into an abandoned pond or lake owned by the City of Vineland. In upholding the granting of a motion for summary judgment in behalf of defendant based on N.J.S.A. 2A:42A-2 et seq. we said:
* * * The language of the statute is clear and unequivocal. It negates the existence of any duty of care on the part of the landowner to any person using the lands for sport and recreational activities, whether it be to keep the premises safe or to give warning of a hazardous condition thereon. And this absence of duty applies whether that person is a trespasser or a license. [at 38-39]
It is true that in Odar v. Chase Manhattan Bank, supra, 138 N.J. Super. at 468, we stated:
* * * It is clear that the statute was intended to apply to non-residential, rural or semi-rural land whereon the enumerated sports and recreational activities are conducted. * * * [Emphasis supplied]
This language is not inappropriate; it is suggested by the history of the legislation and its purposes. But in Odar it was not intended to limit the statutory immunity to undeveloped property lying in "rural or semi-rural" zones. Odar expressly recognized that the change in the statute from "woodlands and agricultural lands" to "premises" was an expansion of the "scope of the immunity granted by the *381 statute." 138 N.J. Super. at 468. It was sufficient in Odar to hold that the statutory immunity barred a claim based upon the death of a person who drowned in an attempted rescue of a trespasser or licensee who was ice skating on a natural pond located on defendant's property. Odar is also consistent with Boileau v. DeCecco, 125 N.J. Super. 263, 267 (App. Div. 1973), which held that the immunity does not apply to claims arising out of the use of residential property "in suburbia" for a private swimming pool.
We agree that the statutory immunity was not intended for injuries occurring in a private swimming pool on residential property, whether in rural, urban or suburban zones. While swimming is a form of recreation specified in N.J.S.A. 2A:42A-2, the statute was aimed at such use or activity by the public in general and does not apply to a specific individual or group of individuals who are expressly invited to swim in a swimming pool on a specific property devoted to residential use as in Boileau v. DeCecco, supra.
Surely the statute should apply where the purposes of the legislation would be fulfilled. One such purpose is to facilitate public recreation and sports on undeveloped tracts of open land and waters. The owners of such property are encouraged to allow such activity to continue; the inducement is the protective cloak of statutory immunity. While the expected activity is more likely to occur on natural, undeveloped lands, that criterion ought not exclude the property owner here who, in 1907, created a large body of water by damming a stream.
Thus, we conclude that the application of the statute depends more upon the nature of the property, in terms of its use for the type of public recreational activity contemplated by the Legislature, than it depends upon the community or neighborhood in which the property is located. There may be a greater coincidence in the approved activity, the type of property and rural or semi-rural areas. We would not expect to find much hunting or trapping in *382 suburbia, though stretches of land there may still support horseback riding and hiking. But the key factors must be the activity and the kind of property and use to which it is put. See Villanova v. American Fed'n of Musicians, Local 16, 123 N.J. Super. 57 (App. Div. 1973), certif. den. 63 N.J. 504 (1973), holding that the statute did not apply to a musician participating in a concert on park property.
It is difficult to express the exact criteria that will position this statute in our body of law so as to give it the effect which the legislature intended, and no more. The conflict with prevailing notions of liability to infant trespassers has been noted. See Magro v. Vineland, supra, 148 N.J. Super. at 38, disapproving of the rationale and conclusions of O'Connell v. Forest Hill Field Club, 119 N.J. Super. 317 (Law Div. 1972), and Scheck v. Houdaille Construction Materials, Inc., 121 N.J. Super. 335 (Law Div. 1972). Normally we would expect the exemption to apply to natural, undeveloped tracts of land or bodies of water. That the large body of water here was not entirely natural, having been formed by a large earthen dam approximately 450 feet long, placed on Robinson's Branch of the Rahway River, does not in our opinion remove this case from the statutory immunity. This body of water is indistinguishable from a wholly natural lake in terms of the legislative intent to encourage recreational use by the public. Surely the frozen water upon which the ice skating occurred was entirely "natural."[2]
*383 Finally, in the companion cases of Trimblett, Adm'r, etc. v. State of New Jersey, and Zajaczkowski v. Department of Environmental Protection, 156 N.J. Super. 291 (App. Div. 1977), we held that N.J.S.A. 2A:42A-1 et seq. affords immunity to the State of New Jersey in death actions instituted in behalf of two men who presumably drowned in the Round Valley Reservoir while boating. Without distinguishing between the "artificial" or "natural" character of the Round Valley Reservoir we said:
* * * Therefore, a private person who permits his property to be used as Round Valley Reservoir was used in the circumstances here has available to him the provisions of N.J.S.A. 2A:43A-3. Since a private owner would not be liable to one who uses his premises for sport or recreational activities the same defense is available to a public entity under the provisions of N.J.S.A. 59:2-1(b). It would be an unreasonable construction of the respective statutes to construe them as providing that the State or other public entity would have a greater tort liability than a private landowner. We therefore conclude that N.J.S.A. 2A:43A-3 precludes liability on the part of the State under the circumstances here. Cf. Magro v. Vineland, 148 N.J. Super. 34 (App. Div. 1977). [at 295].
Accordingly, the entry of judgment for defendants is affirmed.
NOTES
[1] Plaintiff does not claim her case falls within the exceptions provided in N.J.S.A. 2A:42A-4, which reads as follows:

This act shall not limit the liability which would otherwise exist:
a. For willful or malicious failure to guard, or to warn against, a dangerous condition, use, structure of activity; or
b. For injury suffered in any case where permission to engage in sport or recreational activity on the premises was granted for a consideration other than the consideration, if any, paid to said landowner by the State; or
c. For injury caused, by acts of persons to whom permission to engage in sport or recreational activity was granted, to other persons as to whom the person granting permission, or the owner, lessee or occupant of the premises, owes a duty to keep the premises safe or to warn of danger.
[2] We agree with Magro v. Vineland, supra, to the extent that the opinion disapproves of the rationale, particularly expressed by O'Connell v. Forest Hill Field Club, supra, that an exception from the application of N.J.S.A. 2A:42-2 et seq. exists in cases where our preexisting "infant trespasser rule" would apply. But the result in O'Connell may be sustained on different grounds, namely, that the activity of the three-year-old plaintiff and his companions who went onto defendant's golf course "while playing," was not the kind of recreational activity intended by N.J.S.A. 2A:42A-2. (The unsupervised infant fell into a hole on the property which had been excavated during the construction of a dry well.)

We note also that many "infant trespasser" cases (Restatement, Torts, 2d, § 339 (1965); Strang v. South Jersey Broadcasting Co., 9 N.J. 38 (1952)) may not conflict with the Landowner's Liability (Immunity) Act, since infant trespasser cases usually involve injury from artificial conditions or machinery and equipment on a defendant's property. In fact, Restatement, Torts 2d, supra, takes no position with respect to "natural conditions of the land," applying the rule of § 339 to "artificial" conditions only. [At 197]. As noted, the act with which we are concerned would apply to recreational activities conducted, for the most part, on relatively large undeveloped lands or waters. There will be exceptions, however. In Odar v. Chase Manhattan Bank, supra, the land was put to some use for commercial and industrial purposes, but the two ponds on which the ice skating took place were natural ponds. In the case at hand the body of water serving as a reservoir was created by damming a natural waterway and, therefore, the place on which the ice skating occurred had natural as well as artificial characteristics.