THOMAS P. MAHONEY, AND BARBARA MAHONEY, HIS WIFE, PLAINTIFFS-APPELLANTS, v. CARUS CHEMICAL COMPANY, INC., AND CARUS CORPORATION-CARUS CHEMICAL CO. DIVISION; HUNGERFORD & TERRY, INC.; AND INVERSAND COMPANY, JOINTLY, SEVERALLY AND IN THE ALTERNATIVE, DEFENDANTS-RESPONDENTS.

Argued February 19, 1985—Reargued March 3, 1986.
Decided May 21, 1986.

566

*William J. Cook* argued the cause for appellants (*Brown, Connery, Kulp, Wille, Purnell & Greene*, attorneys).

*F. Herbert Owens, III*, argued the cause for respondents Carus Chemical Company, Inc. and Carus Corporation-Carus Chemical Co. Division (*Montano, Summers, Mullen, Manuel & Owens*, attorneys).

*John P. Morris* argued the cause for respondents Hungerford & Terry, Inc. and Inversand Company (*Horuvitz, Perlow, Morris & Baker*, attorneys; *Michael A. Pirolli*, on the brief).

*Barry T. Parker* argued the cause for *amicus curiae* New Jersey State Firemen's Association (*Parker, McCay & Criscuolo*, attorneys).

The opinion of the Court was delivered by

STEIN, J.

In this appeal we consider whether the immunity afforded by the fireman's rule insulates from liability a defendant whose willful and wanton misconduct is the proximate cause of the fire that compelled the fireman's presence at the fire scene and caused him to sustain injury. A related issue concerns the

application of the fireman's rule to the manufacturer of a defective product that is alleged to have caused the fire in which the firefighter was injured.

I

Plaintiff Thomas P. Mahoney was a volunteer firefighter with the Highland Chemical Engine Company of Pitman, New Jersey. On June 19, 1978, duty called him to the scene of a fire at the Inversand Company chemical plant in Sewell, New Jersey. Based on his prior knowledge of the Inversand business, he knew the fire to be chemical in nature. He concedes that he understood the severe risk of entering a building engulfed by a chemical fire, including the risk of the structure falling. While straddling the threshold of the burning building, a structural wall collapsed on him, trapping him inside the building and causing his injuries. He sued Inversand, Inversand's parent, Hungerford & Terry, Inc., and Carus Chemical Company, Inc. (Carus), the Illinois corporation that supplied Inversand with the highly-combustible substance that allegedly caused the fire.[1] Plaintiff was prepared to prove at trial that as a result of the accident at the fire-fighting scene, he was critically injured, suffering massive burns on his body, crushing injuries to his right-upper extremities, fractures of the right arm and pelvis, and multiple abrasions and contusions. The trial court, relying on the "fireman's rule," *Krauth v. Geller*, 31 *N.J.* 270 (1960), granted summary judgment in favor of all defendants. The Appellate Division affirmed. We granted plaintiff's petition for certification. 96 *N.J.* 314 (1984).

Our principal focus is on his claim against Carus. The gravamen of that claim, as disclosed by the complaint and documents obtained during discovery, is that the fire at the Inversand warehouse spontaneously ignited in one of a ship-

---

[1] Plaintiff Barbara Mahoney, Thomas' wife, sued as well for her derivative losses. For ease of analysis, in this opinion we shall refer only to the plaintiff-fireman.

ment of fiber-paper drums containing potassium permanganate powder (brand name "Cairox") manufactured by Carus and received by Inversand approximately two hours before the fire; that Carus, based on a series of similar fires, knew that shipment or storage of Cairox in fiber-paper drums created a significant danger of spontaneous ignition; that the risk of spontaneous ignition of Cairox in fiber-paper drums was so substantial that Carus, in internal memoranda and in a communication to customers a month before the Inversand fire, had announced its decision to replace the fiber-paper drums with metal containers; that the shipment to Inversand included 86 metal drums of Cairox, none of which burned, and 100 fiber-paper drums, virtually all of which burned; and that Carus had continued to ship Cairox in fiber-paper drums in order to exhaust its supply of such drums before making the switch to metal containers.

Documents submitted by plaintiff in opposition to defendants' summary judgment motions set forth a detailed factual background in support of the allegations in the complaint. According to plaintiff, Carus is the sole United States manufacturer of potassium permanganate, a chemical used both as an oxidizing agent and as a disinfectant. Plaintiff contends that potassium permanganate is a dangerous compound because it readily causes fire when placed in contact with combustible materials. Plaintiff's documents included excerpts from scientific manuals that plainly identified the fire hazard inherent in potassium permanganate, describing it as a "[p]owerful oxidizing material [that] [r]eacts violently with finely divided easily oxidizable substances [and] [i]ncreases flammability of combustible materials."

Potassium permanganate's hazardous properties were confirmed by plaintiff's consulting engineer in a report that was part of the trial court record:

> Potassium permanganate belongs to a class of chemical compounds known as inorganic oxidizers. These oxygen-rich compounds accelerate the burning of combustible materials. $KNnO_4$ [potassium permanganate] is one of the com-

pounds used to promote and accelerate the burning of solid propellants. $KMnO_4$ invariably intensifies the burning of combustible materials by acting as a "chemical supercharger". The speed of its reactivity is exponential with rising temperatures.

In NFPA's Fire Protection Guide on Hazardous Materials (3rd ed.), it is recognized that $KMnO_4$ reacts violently when mixed or combined with combustible materials.

According to plaintiff, Carus did not ship potassium permanganate in fiber-paper drums until December, 1975. Carus allegedly considered using fiber drums in 1965, but rejected the idea because it recognized that "[t]here is a greater potential fire hazard when fiber is used in place of metal as a container." It is uncontroverted, however, that in late 1975 Carus began using fiber-paper drums to ship potassium permanganate. Plaintiff alleges that this was an economic decision predicated on Carus's estimate that it could save $35,000 annually by using the less expensive, fiber-paper drums. Plaintiff also alleges that Carus recognized the increased hazard to its own premises when it acknowledged that "[i]t is most likely that we would have to install a sprinkler system in the Cairox warehouse if we switch to fibre containers." It is also uncontroverted that the bottom and sides of the fiber drums used for shipping potassium permanganate were "combustible," and in its answers to interrogatories, Carus conceded that potassium permanganate "increases [the] flammability of combustible materials" and "should be kept away from [certain] combustible materials."

An internal Carus memorandum entitled "Reported Fires Involving Cairox in Fibre Drums" was also part of the trial court record. This document revealed that beginning in February, 1976, two months after Carus initiated the shipment of potassium permanganate in fiber drums, a series of spontaneous, unexplained fires occurred at various Cairox storage locations causing partial or total destruction of the fiber drums as well as considerable damage to surrounding property. Pertinent portions of this document reveal the following information:

REPORTED FIRES
INVOLVING CAIROX[R] IN FIBRE DRUMS

| Date | Geographic Location | Specific Place the Fire Occurred | Probable Cause of Ignition | Damage |
|---|---|---|---|---|
| 25/26 Feb. '76 | 50 miles north of Sault Ste. Marie, Canada | trailer with 30 drums $KMnO_4$ (3,000kg) | spontaneous reaction between $KMnO_4$ and isopropyl ethyl thiono carbamate; physical damage to fibre drum (apparently) was involved also | total loss of trailer and cargo, and other damage |
| 23 May '76 | Huntington, B.C. | railroad freight car with 18,933-lb. $KMnO_4$ | no clues | partial loss of cargo, damage to car |
| 8 Feb. '78 | Booneville, AR | railroad freight car with 450 fibre drums $KMnO_4$ (60,220 lb.) | damaged containers? friction? | total loss of freight cars with cargo |
| 31 Mar. '78 | Doraville, GA (Ashland) | trailer 220 50-kg drums | no clues | total loss of trailer and cargo |
| 10 Apr. '78 | Sparrows Point, MD (Bethlehem Steel) | warehouse | possible interaction with thiourea | $11,000 worth of physical damage plus 60 hours worth of labor |
| 19 June '78 | Sewell, NJ (Inversand) | warehouse | no clues | loss of warehouse |
| 15 Aug. '78 | 3 miles north of New Bern, NC | truck containing 10 drums (1,000-kg) $KMnO_4$ | no clues | damage to truck, clean-up costs, total $3,814 |

Plaintiff alleges that after the seventh fire in August, 1978, Carus discontinued the use of fiber drums and that there have been no reported incidents of such fires since then.

Carus concedes that it decided to discontinue the use of fiber drums after a fire at Bethlehem Steel Company on April 10, 1978. An internal Carus marketing memorandum dated April 17, 1978, confirms this decision: "As a result of a series of fires involving Cairox in fiber drums, we have decided to eliminate the use of fiber drums and revert to all metal drums." On May 5, 1978, Carus communicated this decision to its customers in writing, informing them that this change would result in a cost increase of 1.5¢ per pound to be passed on to them. Carus justified its decision as follows:

> As you know, some time ago we switched our packaging from metal drums to fibre drums. Whether by coincidence or not, there has been a higher rate of incidents of fires involving our chemical since we have been packaging in fibre drums than before when we packaged in metal drums. Accordingly, in order to minimize the fire risks, we are again switching to metal drums.

Carus shipped 31,460 pounds of potassium permanganate to Inversand on June 13, 1978. Notwithstanding its announced change of policy regarding the use of fiber drums, approximately 22,000 pounds were shipped in 100 fiber drums. The balance was shipped in 86 metal drums. The shipment arrived at the Inversand warehouse at about 11:30 a.m. on June 19, 1978. At approximately 12:45 p.m., an Inversand employee noticed pink smoke coming out of a Cairox fiber drum that was stored inside the warehouse. Fire broke out and spread to the other fiber drums. Seven volunteer fire companies and five rescue squads responded to the alarm. The warehouse was substantially destroyed. Volunteer fireman Mahoney was standing at the entrance to the building when a structural wall collapsed on him, causing severe and permanent personal injuries.

## II

In establishing the fireman's rule in New Jersey, this Court expressly considered the relationship between the conduct responsible for causing a fire and the fireman's right to recover for injuries sustained in fighting the fire:

> [W]hat is meant is that it is the fireman's business to deal with that very hazard and hence, perhaps by analogy to the contractor engaged as an expert to

> remedy dangerous situations, he cannot complain of negligence in the creation of the very occasion for his engagement. * * * Probably most fires are attributable to negligence, and in the final analysis the policy decision is that it would be too burdensome to charge all who carelessly cause or fail to prevent fires with the injuries suffered by the expert retained with public funds to deal with those inevitable, although negligently created, occurrences. Hence, for that risk, the fireman should receive appropriate compensation from the public he serves, both in pay which reflects the hazard and in workmen's compensation benefits for the consequences of the inherent risks of the calling. [*Krauth v. Geller, supra,* 31 *N.J.* at 273–74.]

The *Krauth* Court considered but did not decide whether the bar of the fireman's rule would immunize from liability one whose conduct was more culpable than ordinary negligence. The opinion implies that an arsonist or one who reports a false alarm would not enjoy immunity: "We are not concerned with the liability to a fireman of an arsonist or one who deliberately induces a false alarm." *Id.* at 277. The opinion appears to acknowledge that the policy considerations underlying the rule could not justify an immunity that would protect the intentional wrongdoer.

The premise that the fireman's rule should not immunize the intentional wrongdoer is generally supported. *See, e.g., Berko v. Freda,* 93 *N.J.* 81, 90 (1983) ("Of course, nothing in the fireman's rule prevents Officer Berko from suing the thief. * * * [T]he public policy underlying the fireman's rule simply does not extend to abuse directed specifically at a police officer."); *Ferraro v. Demetrakis,* 167 *N.J.Super.* 429, 433 (App.Div.) (intentional, malicious conduct would require a waiver of the fireman's rule), certif. denied, 81 *N.J.* 290 (1979); *Grable v. Varela,* 115 *Ariz.* 222, 564 *P.*2d 911 (Ct.App.1977) (assuming, *arguendo,* that arson is an exception to the fireman's rule, the facts do not show arson); *Krueger v. City of Anaheim,* 130 *Cal.App.*3d 166, 181 *Cal.Rptr.* 631 (Ct.App.1982) (policemen have the right to recover where injuries are intentionally inflicted); *Woodland Mut. Fire Ins. Co. v. Palmi,* 366 *N.W.*2d 125 (Minn.Ct.App.1985) (landowner could not avoid liability for an intentional tort); *see also* Comment, "Negligence Actions by Police Officers and Firefighters: A Need for a Professional

Rescuer's Rule," 66 *Cal.L.Rev.* 585, 602 (1978) ("[I]t has been recognized that intentional torts against professional rescuers create liability even when the risk that causes injury is created by the emergency that the professional rescuer seeks to relieve."); 2 *F. Harper & F. James, Law of Torts,* § 27.14, 1504 (1956) ("The occupier must, of course, refrain from intentionally or wantonly injuring such officers.").

There is no difficulty in identifying the basis for excluding from the scope of the "fireman's rule" conduct that intentionally causes injuries to firemen or policemen. In balancing the policy interests that define the rule, it was recognized that "[p]robably most fires are attributable to negligence," *Krauth v. Geller, supra,* 31 *N.J.* at 274. Accordingly, fires originating from careless and negligent acts were considered to be so basic a component of the fireman's public responsibility that "the policy decision is that it would be too burdensome to charge all who carelessly cause or fail to prevent fires with the injuries suffered by the expert retained with public funds to deal with those inevitable, although negligently created, occurrences." *Id.* When a fire is intentionally set, the rationale for immunity breaks down. Common experience indicates that the vast majority of fires are not the product of intentional misconduct. Therefore, exposing the wrongdoer to liability will not place a burden generally upon the public, but only upon those whose deliberate conduct warrants the denial of immunity. Moreover, recognition of moral fault as a component of public policy is a common principle of tort law. *W. Prosser and W. Keeton on the Law of Torts,* §§ 8, 37 (5th ed. 1984); Bauer, "The Degree of Moral Fault as Affecting Defendant's Liability," 81 *U. of Pa.L.Rev.* 586 (1933).

Furthermore, considerations of fairness support the grant of immunity from suit by firemen or policemen to a citizen whose conduct is merely negligent. Hazards negligently created are staples of the duties firemen and policemen are expected to perform. Although the citizen immunized is not

free from fault, the quality of fault is not so severe that the grant of immunity from liability for injuries sustained by firemen and policemen in the ordinary course of their duties offends our common sense of justice. By contrast, the degree of fault of the intentional wrongdoer is substantial. Thus, to accord immunity to one who deliberately and maliciously creates the hazard that injures the firemen or policemen stretches the policy underlying the fireman's rule beyond the logical and justifiable limits of its principle.

Many of the same considerations apply when the hazards to which firemen or policemen are exposed are caused not intentionally but by willful and wanton misconduct. This Court has consistently recognized the importance of the distinction between willful and wanton conduct and ordinary negligence. *See, e.g., Foldi v. Jeffries,* 93 *N.J.* 533, 549 (1983); *McLaughlin v. Rova Farms, Inc.,* 56 *N.J.* 288, 305–10 (1970); *Carney v. Gordon and Wilson Co.,* 153 *N.J.Super.* 109, 112–13 (App.Div. 1977); *Iaconio v. D'Angelo,* 104 *N.J.L.* 506, 508 (E. & A. 1928); *Staub v. Public Serv. Ry. Co.,* 97 *N.J.L.* 297, 299–300 (E. & A. 1922). Our concept of willful and wanton conduct has been expressed in these terms:

> [I]t must appear that the defendant with knowledge of existing conditions, and conscious from such knowledge that injury will likely or probably result from his conduct, and with reckless indifference to the consequences, consciously and intentionally does some wrongful act or omits to discharge some duty which produces the injurious result. [*McLaughlin v. Rova Farms, Inc., supra,* 56 *N.J.* at 305.]

*See Restatement (Second) of Torts* § 500; *Prosser and Keeton, supra* § 34, at 212–14.

The difference between an intentional act and willful and wanton misconduct is merely one of degree. For an act to be intentional, the actor must intend the harm or realize with substantial certainty that harm is likely to result. For an act to constitute willful and wanton misconduct, the act must be intended, but not the resulting harm; the actor need only "realize[] * * * that there is a strong probability that harm may result." *Restatement (Second) of Torts* § 500(f); *see also*

*Berg v. Reaction Motors Div.*, 37 *N.J.* 396, 413–14 (1962) (compilation of cases indicating that the willful and wanton misconduct requirement "may be satisfied upon a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences.").

In *Krauth v. Geller, supra*, 31 *N.J.* 270, this Court did not decide whether the fireman's rule would bar recovery for an injury caused by willful and wanton misconduct, although it did suggest in dictum that "it is debatable whether degrees of culpability are at all pertinent." *Id.* at 277. In *Ferraro v. Demetrakis, supra*, 167 *N.J.Super.* at 433, the Appellate Division specifically held that willful and wanton misconduct does not erode the immunity afforded by the fireman's rule.

Courts in other jurisdictions are divided on the question. Some courts have held that the fireman's rule does not bar recovery when the hazard was caused by willful and wanton misconduct. *Buchanan v. Prickett & Son, Inc.*, 203 *Neb.* 684, 279 *N.W.*2d 855, 858–59 (1979) (citing *Wax v. Co-Operative Refinery Ass'n*, 154 *Neb.* 805, 49 *N.W.*2d 707 (1951)); *Rishel v. Eastern Airlines, Inc.*, 466 *So.*2d 1136, 1138 (Fla.Dist.Ct.App. 1985); *Wilson v. Florida Processing Co.*, 368 *So.*2d 609, 610 (Fla.Dist.Ct.App.1979); *Whitten v. Miami-Dade Water & Sewer Auth.*, 357 *So.*2d 430, 432–33 (Fla.Dist.Ct.App.), *cert.* denied, 364 *So.*2d 894 (1978); *Marquart v. Toledo, Peorio & Western R.R. Co.*, 30 *Ill.App.*3d 431, 433, 333 *N.E.*2d 558, 560 (App.Ct. 1975); Annot., 11 *A.L.R.* 4th 597, 613 (1982).

Other courts have reached the opposite conclusion. For example, in *Hubbard v. Boelt*, 28 *Cal.*3d 480, 169 *Cal.Rptr.* 706, 620 *P.*2d 156 (1980), a police officer injured during a high speed chase of a traffic offender sued to recover damages. In a 5–2 decision the California Supreme Court held that the fireman's rule barred recovery, notwithstanding the plaintiff's allegations that his injuries were caused by the defendant's reckless and wanton misconduct that occurred after the speed-

ing offense that caused the officer to begin his pursuit. The majority, relying on *Holden v. Chunestudey*, 101 *Cal.App.*3d 959, 161 *Cal.Rptr.* 925 (Ct.App.1980), concluded that the fireman's rule applied to both negligent and reckless conduct. *Hubbard v. Boelt, supra*, 28 *Cal.*3d at 484, 169 *Cal.Rptr.* at 709, 620 *P.*2d at 159. In dissent, Justice Tobriner admonished that the majority

> ha[d] transformed the fireman's rule from a restrained doctrine that simply protects the average homeowner or citizen from potentially severe liability for mere acts of negligence in creating a situation as to which firemen and policemen are employed to respond, into a sweeping, across-the-board rule that forbids firemen and policemen from recovering any damages from persons who, with knowledge of a safety officer's presence on the scene, intentionally engage in wilful and wanton misconduct which results in serious injury to the officer. [*Id.* at 487, 169 *Cal.Rptr.* at 710, 620 *P.*2d at 160.] [2]

*See also Grable v. Varela, supra*, 115 *Ariz.* 222, 224, 564 *P.*2d 911, 913 (fireman's rule bars suit even if fire started recklessly).

In the context of other immunity doctrines, this Court has found willful and wanton misconduct to constitute an appropriate exception to the general rule of immunity. For example, in the area of parental immunity, we have recognized willful and wanton misconduct as a valid exception to the traditional grant of immunity for the negligent supervision of a child. *Foldi v. Jeffries, supra*, 93 *N.J.* at 533. In the field of charitable immunity, while holding that negligence in hiring was protected by the immunity conferred by *N.J.S.A.* 2A:53A–7 we acknowledged that our decision left unsettled the statute's application to acts of reckless misconduct. *Schultz v. Roman Catholic Archdiocese of Newark*, 95 *N.J.* 530, 599 (1984).

In the field of sovereign immunity, our Legislature has protected public entities from liability for injuries caused by dangerous conditions created by negligent acts of the public

---

[2]The dissenting opinion does not generally endorse an exemption from the fireman's rule for willful and wanton misconduct but asserts that such an exemption clearly applies when the misconduct occurs after the officer has arrived at the scene.

entity; this immunity, however, is lost if the action or lack of action relating to the dangerous condition was "palpably unreasonable." *N.J.S.A.* 59:4–2; *N.J.S.A.* 59:2–3(d); *see Brown v. Brown*, 86 *N.J.* 565, 578 (1981). The extent of the public entity's culpability beyond ordinary negligence is the critical factor in the statutory scheme.

The arguments against excluding hazards caused by willful and wanton misconduct from the protection of the fireman's rule are self-evident. First, it is contended that the hazard encountered by the fireman is no different when it is caused by an act constituting ordinary negligence from what it is when the act creating the hazard constituted willful and wanton misconduct. This argument is premised on the assumption that the immunity is correlative with the risk, and if the risk is the same, the conduct that created the risk should not determine whether the immunity should be available to the wrongdoer.

But as Chief Justice Weintraub pointed out in *Krauth v. Geller, supra,* 31 *N.J.* 270, the nature of the risk confronted by the firemen or policemen is only part of the public policy equation. The other part derives from the Court's observation that "most fires are attributable to negligence," and "it would be too burdensome to charge all those who carelessly cause * * * fires with the injuries suffered by the expert retained with public funds to deal with [them]." *Id.* at 274. It follows that in the extreme case in which the hazard is not created by ordinary negligence but by conduct decidedly more culpable—either intentional acts, or willful and wanton misconduct—the public policy balance that supports immunity in the case of ordinary negligence has been fundamentally altered. The risk may be the same but the conduct causing the risk is extraordinarily culpable. In such cases, as a matter of fairness, deterrence, and sound public policy, the burden sought to be avoided by the fireman's rule for the ordinary citizen who commits ordinary negligence should be visited upon the extraordinary wrongdoer.

It is also asserted that an exception to the fireman's rule for acts of willful and wanton misconduct would cause uneven treatment among policemen and firemen, with the arguably anomalous result that the amount of compensation received by two policemen or two firemen, who sustain identical injuries, may vary substantially because of a difference in the conduct that caused the hazard to which they were exposed. A short answer is that policemen and firemen would undoubtedly prefer a rule that produces uneven results to one that unfairly and unnecessarily immunizes the intentional or reckless perpetrator of a hazard. Moreover, any rule of law that falls short of compensating *all* firemen for *all* injuries sustained in fighting fires will produce disparate results. Justice Clifford, in dissent, would allow recovery by a fireman injured in a fire set by an arsonist. *Post* at 582 n. 3. Even the abandonment of the fireman's rule, as urged by Justice Handler in his dissent, would result in uneven treatment: firemen injured by negligently-caused fires could recover damages while those injured by fires where fault was not a factor would be barred from recovery. In our view, disparity among firemen in their right to recover damages is a poor reason for immunizing those who intentionally or recklessly cause fires that injure firefighters. If uniformity of compensation is considered to be essential, as a matter of public policy, the Legislature is the appropriate body to effectuate that result.

Finally, it is contended that the difficulty of distinguishing ordinary negligence from willful and wanton misconduct will impose an unreasonable burden upon the trial courts and lead to unnecessary and frivolous claims. This Court has frequently encountered and rejected analogous warnings directed at modifications of tort law. *See People Express Airlines, Inc. v. Consolidated Rail Corp.*, 100 *N.J.* 246, 253–54 (1985); *Rosenblum v. Adler*, 93 *N.J.* 324, 348 (1983). We adhere to Justice Francis's response to similar contentions in *McLaughlin v. Rova Farms, supra*, 56 *N.J.* at 305–06: "The fact that the differences in gravity of fault cannot be stated with mathematical precision

should not prevent the courts from administering a scheme of liability that is based upon the seriousness of the actor's misconduct." We expect that trial courts will carefully scrutinize claims alleging willful and wanton misconduct in the context of our holding today. *Cf. Entwistle v. Draves*, 102 *N.J.* 559, 561-562 (1986).

■ Accordingly, we hold that the immunity of the fireman's rule does not extend to one whose willful and wanton misconduct created the hazard that caused injury to the fireman or policeman.

## III

■ Applied to the facts alleged by the plaintiff, this exclusion of willful and wanton misconduct from the immunity of the fireman's rule requires a reversal of the summary judgment in favor of Carus. Plaintiff's allegations and preliminary proofs, enhanced by the favorable inferences to which he is entitled on a motion for summary judgment, *Viviano v. CBS, Inc.*, 101 *N.J.* 538, 542 (1986); *Judson v. Peoples Bank & Trust Co. of Westfield*, 17 *N.J.* 67, 74-75 (1954), amply support a cause of action based on willful and wanton misconduct. The allegations and proofs suggest that Carus was fully aware that potassium permanganate increases the flammability of combustible materials such as the fiber containers Carus began using in 1975. Plaintiff's allegations indicate that Carus not only knew that the fiber containers had spontaneously ignited on a number of prior occasions causing substantial damage, but that Carus had communicated privately and publicly its conclusion that the danger of spontaneous combustion was so great that use of the fiber containers should cease. Nevertheless, in the face of this knowledge, Carus shipped 100 fiber containers of potassium permanganate to the Inversand warehouse for no other apparent reason than the desire to use up its stock of these containers. Such conduct, if proved, plainly reflects that Carus possessed the requisite knowledge of existing hazardous

conditions, the consciousness that injury was likely to result from its conduct, and the reckless indifference to injurious consequences that characterize our recognition of willful and wanton misconduct as a separate basis for liability. *McLaughlin v. Rova Farms, Inc., supra,* 51 *N.J.* at 305–06.

## IV

Plaintiff's complaint also alleged a cause of action against Carus based on products liability. The trial court dismissed that claim as encompassed by the immunity afforded by the fireman's rule. Plaintiff and *amicus,* New Jersey State Firemen's Association, contend that recovery for injuries to firemen sustained at fires caused by defective products should not be barred by the rule. They assert that the risk-spreading rationale of products-liability law justifies the imposition of liability on manufacturers and distributors of defective products, who are best able to absorb and redistribute the cost of injuries resulting from those products. The justification advanced is that the manufacturer is in a better position than the fireman to make the cost/benefit analysis between accident costs and accident avoidance costs. *See Suter v. San Angelo Foundry & Mach. Co.,* 81 *N.J.* 150, 173 (1979).

Precedent in other jurisdictions reveals divergent conclusions as to the rule's application in a products liability or strict liability context. *Calvert v. Garvey Elevators, Inc.,* 236 *Kan.* 570, 694 *P.*2d 433 (1985) (public policy requires that even if ultrahazardous activity created need for presence of firefighter, "fireman's rule" remains applicable); *Armstrong v. Mailand,* 284 *N.W.*2d 343 (Minn.1979) (fireman's rule bars recovery in actions based on negligence *per se,* strict products liability, or strict liability for an abnormally dangerous activity); *Lipson v. Superior Court,* 31 *Cal.*3d 362, 182 *Cal.Rptr.* 629, 644 *P.*2d 822 (1982) (only if owner's maintenance of an ultrahazardous activity or condition produces a separate injury may fireman seek to recover on a theory of strict liability); *Court v. Grzelinski,* 72

*Ill.*2d 141, 19 *Ill.Dec.* 617, 379 *N.E.*2d 281 (1978) (to extent fireman is person to whom injury from product may reasonably be foreseen, he may recover in products liability, even though his injury was incurred while fighting a fire in course of his employment).

An apparent difficulty with the risk of loss-cost/benefit analysis advanced by plaintiff is that as between a fireman and a negligent commercial property owner, this rationale would appear to apply with equal force in favor of the fireman. Like the manufacturer, the commercial property owner can balance the cost of prevention against the risk of loss and, compared to firefighters, is likely to be better able to absorb the costs of the fireman's injuries sustained in fighting a fire. To accord the benefit of the fireman's rule to the commercial landowner and not the manufacturer cannot easily be justified on the basis of risk allocation.

In determining the relationship of the fireman's rule to the rule of strict liability for product defects, we focus on the purposes served by these overlapping doctrines of tort law. The fireman's rule is an exception to ordinary negligence liability, based on the recognition that since the fireman's function is to combat fires caused by the public's carelessness, the liability for injuries sustained by firemen should not be borne by the intended beneficiaries of their services. That exemption from liability would appear to apply to the ordinary manufacturer who, like other citizens, is entitled to protection from fires caused by product defects and other causes.

Nor should the exemption afforded by the fireman's rule be regarded as inconsistent with the doctrine of strict products liability, whose purpose is to eliminate the necessity for proving negligence when injury is caused by a defective product. *O'Brien v. Muskin Corp.*, 94 *N.J.* 169, 179 (1983). Because the fireman's rule tolerates ordinary negligence, and the doctrine of strict products liability treats market function as a substitute for proof of ordinary negligence, there is no apparent inconsist-

ency between the two rules and no justification for excluding manufacturers from the exemption afforded by the fireman's rule. Fires created by defective products do not pose a fundamentally different risk to firefighters from that posed by fires instigated by other causes. We find no rationale consistent with the policy underlying the fireman's rule that justifies a different treatment of manufacturing as distinguished from all other commercial activities. Accordingly, we do not recognize an exception to the fireman's rule based solely on strict liability for defective products.

## V

Because the primary focus of the trial court was upon the issues of choice of law [3] and application of the "fireman's rule" in the products-liability arena, the issues relating to plaintiff's claims against the occupier of the premises may have been overlooked. As we understand his cause of action against Inversand and Hungerford & Terry, Inc., it sets forth various theories of liability, including the negligent handling of the fire when it started, and the failure to warn of the structural defects.

In *Berko v. Freda, supra,* we were careful to point out that the fireman's rule "speaks only to the negligence that started the fire." 93 *N.J.* at 85. Case law draws a distinction between injury stemming from the negligence that brought the firefighters or police to the scene in the first place, and injury suffered from independent causes that follow. For example, in *Lipson v. Superior Court, supra,* 31 *Cal.*3d 362, 182 *Cal.Rptr.* 629, 644 *P.*2d 822, firefighters arriving at a boil-over in a chemical plant were told by the owner that no toxic chemicals were in the building. The building did, in fact, store toxic chemicals, which caused the firefighter's injury. In allowing recovery, the

---

[3] Plaintiff argued that since Carus was an Illinois corporation, the application of the fireman's rule to a manufacturer whose defective product causes the fire should be governed by Illinois law. The trial court rejected this contention.

court wrote: "A fireman assumes only those hazards which are known or can reasonably be anticipated at the site of the fire." *Id.* at 371, 182 *Cal.Rptr.* at 635, 644 *P.*2d at 828.

Plaintiff has carefully crafted the allegations of his complaint to seek to allege circumstances not covered by the "fireman's rule." The trial court's opinion dealt with only one aspect of the allegations against Inversand and Hungerford & Terry, Inc., namely, whether the defendants had engaged in willful and wanton conduct. We are satisfied that there are other allegations set forth in the complaint that raise triable issues of facts as to whether these defendants are excused from liability because of the "fireman's rule." It may be that plaintiffs will not be able to demonstrate that, in fact, the injuries were the proximate result of the defendants' failure to warn of the structural makeup of the building or a hidden defect in that structure, or of its subsequent negligence in failing properly to combat the fire once it had commenced on the premises. Suffice it to say that these questions are for the finder of fact to resolve. *See Brown v. United States Stove Co.,* 98 *N.J.* 155, 170–71 (1984); *Soler v. Castmaster,* 98 *N.J.* 137, 153 (1984).

The judgment of the Appellate Division is reversed and the cause is remanded for further proceedings in accordance with this opinion.

CLIFFORD, J., dissenting in part.

Today's exercise is one not so much of law as it is of policy. Indeed, the "fireman's rule," only recently acknowledged to be "a fixture in our jurisprudence," *Berko v. Freda,* 93 *N.J.* 81, 83 (1983), is grounded almost exclusively in policy considerations, decked out a bit in the garb of common-law principles of duty and assumption of risk. At heart the rule rests on the notion that

> [t]here is [no duty] owed the fireman to exercise care so as not to require the special services for which he is trained and paid. * * * [I]n the final analysis the policy decision is that it would be too burdensome to charge all who carelessly cause or fail to prevent fires with the injuries suffered by the expert

retained with public funds to deal with those inevitable, although negligently created, occurrences. Hence, for that risk, the fireman should receive appropriate compensation from the public he serves, both in pay which reflects the hazard and in workmen's compensation benefits for the consequences of the inherent risks of the calling. [*Krauth v. Geller*, 31 *N.J.* 270, 274 (1960), *quoted in Berko v. Freda, supra*, 93 *N.J.* at 85.]

What has evolved from *Krauth* in the twenty-six years that have passed since it was decided is a sensible, straightforward, bright-line rule, distinguished by its ease of application: if a fireman is hurt as a result of his exposure to the risks of injury that are inevitably involved in firefighting, then his recourse lies with the public fisc, not with the tortfeasor. See *Berko v. Freda, supra*, 93 *N.J.* 81, and cases cited therein.

But now the Court concludes that considerations of "fairness, deterrence, and sound public policy," *ante* at 577, require that an exception be carved out of the "fireman's rule" for those situations in which a defendant is guilty of willful and wanton misconduct. That determination is, at bottom, a judgment call.

The Court's opinion could hardly be improved on as a reasoned statement in support of the exception, but I come down on the other side of the issue. As Chief Justice Weintraub took pains to point out in *Krauth*,

[w]antonness is not too precise a concept. It is something less than intentional hurt, and so viewed is an advanced degree of negligent misconduct. In the context of the policy considerations which underlie the rule of non-liability for negligence with respect to the origination of a fire, it is debatable whether degrees of culpability are at all pertinent. [31 *N.J.* at 277.]

Notice first that the *Krauth* Court by no means sought to obliterate the distinction between willful, wanton conduct on the one hand and ordinary negligence on the other. As the majority points out, *ante* at 574, "[t]his Court has consistently recognized the importance of [that] distinction * * *." In no case in which the distinction has been recognized and applied, however, have we even hinted that the difference between ordinary negligence and willful-wanton misconduct should afford a basis for favoring a victim whose job it is to confront the very risks that give rise to his employment in the first place, irrespective of their cause. Those different degrees of negligence are irrele-

vant to the "fireman's rule." "It is not important in the application of the 'fireman's rule' to determine what caused the particular danger which brought about the injury. Of critical importance is whether the particular danger is one that the fireman would anticipate in the performance of his duties." *Court v. Grzelinski*, 72 *Ill*.2d 141, 154, 19 *Ill.Dec.* 617, 623, 379 *N.E.*2d 281, 287 (1978) (Ryan, J., dissenting).

Hence, in adverting to the distinction between ordinary negligence and conduct that may be characterized as willful and wanton, *Krauth* picked its target with precision: the pertinency of that distinction "[i]n the context of the policy considerations which underlie the rule of non-liability for negligence with respect to the origination of a fire." 31 *N.J.* at 277.

Those policy considerations, stated at the beginning of this opinion, were reaffirmed in *Berko v. Freda, supra*, 93 *N.J.* 81,

There is at work here a public policy component that strongly opposes the notion that an act of ordinary negligence should expose the actor to liability for injuries sustained in the course of a public servant's performance of necessary, albeit hazardous, public duties. In the absence of a legislative expression of contrary policy, a citizen should not have to run the risk of a civil judgment against him for negligent acts that occasion the presence of a firefighter at the scene of a carelessly-set fire or of a police officer at a disturbance or unlawful incident resulting from negligent conduct. [*Id.* at 88–89 (footnote omitted).]

The policy considerations are couched in terms of ordinary negligence simply because that was the quality of conduct at issue in *Krauth* and *Berko*.[1] I would find those same considerations controlling in the "willful-wanton" situation, as in this case.

As I understand it, the Court would permit plaintiff's case to go forward against Carus on the willful-wanton theory, but would not allow the same plaintiff to proceed against defendant Inversand, the occupier of the premises, on a claim of simple

---

[1]But it is worth noting that *Krauth* specifically rejected the precise invitation that the Court today accepts: "We are *asked to hold* that 'wanton' conduct resulting in a fire and consequent alarm [sic: harm?] will suffice for the imposition of liability." 31 *N.J.* at 277 (emphasis added).

negligence in the form of, say, sloppy housekeeping (failure to isolate combustible materials), or a careless employee's failure to extinguish a cigarette, or an overworked plant electrician's primitive wiring job. Same fireman, same hazard, same accident, same injury, same causes acting together to produce the very same fire (Carus's willfully and wantonly negligent use and shipment of hazardous containers plus Inversand's negligence in any one of a limitless variety of forms). Result: potential liability of Carus, no cognizable claim against Inversand.[2] Or, hypothetically, two firemen fighting separate fires in different locations. Same hazard, same kind of accident, same injury. One sues in willful and wanton misconduct, the other sues in simple negligence: the first recovers, the second is barred by what has now become the tattered remains of the "fireman's rule." I do not view as sound a policy that can—and will—produce such quaint results as between identically situated plaintiffs. That circumstance should give one pause.

If the "fireman's rule," now a quarter of a century old, be viewed as harsh, if the results of its application create queasiness, the Court is free to scrap it, as urged by Justice Handler (as one may have gathered, I would keep the rule), or the legislature is free to change it. To date that body has apparently been content with the immunity afforded by the rule.

Which brings me to the majority's point *ante* at 578 that "policemen and firemen would undoubtedly prefer a rule that produces uneven results to one that unfairly and unnecessarily immunizes the intentional[3] or reckless perpetrator of a haz-

---

[2] As stated at the conclusion of this opinion, I agree that there may be lurking somewhere in plaintiff's allegations against Inversand a question for resolution by the fact-finder in respect of one of the exceptions to the "fireman's rule," dealing with negligent conduct independent of that which caused the fire.

[3] Of course, we do not here deal with the arsonist or with one who *intentionally* and *maliciously* causes injury to the fireman. In that situation I would think the policy factors would shift and the rule of non-liability would evaporate. Policy-making is, after all, the art of drawing lines. No civilized system

ard." Maybe. But the fact remains that *Krauth*, with its clear implication that proof of a higher degree of recklessness would not serve to avoid the rule, has been on the books since 1960, and *Ferraro v. Dematrakis*, 167 *N.J.Super.* 429 (App.Div.) certif. den., 81 *N.J.* 290 (1979), with its declaration that "wanton conduct with respect to the cause of a fire would not require waiver of the general [fireman's] rule," *id.* at 433, has been around for more than six years. During all or part of that time the *amicus curiae*, New Jersey State Firemen's Association, has lobbied in the legislative hallways for the interests of firefighters, as has the New Jersey State Police Benevolent Association, *amicus curiae* in the companion case decided today, *Entwistle v. Draves*, 102 *N.J.* 559 (1986), for the interests of the State Police. It is almost a matter susceptible of judicial notice that those associations are among the most active, most vocal, and most effective in their representational endeavors. Despite this, their attorneys at oral argument before us could point to not one effort on the part of those associations—or for that matter on the part of any other firemen's or police organization—to persuade the legislature to abolish or limit the "fireman's rule," so firmly and so long established in our case law. One must assume that those associations—and if not they, surely the legislature—are satisfied with the rule as it has existed up until today.

I join in parts IV and V of the Court's opinion. I dissent from so much of the balance of the opinion as would deprive defendant Carus of the benefit of the "fireman's rule."

HANDLER, J., dissenting in part.

The Court now holds "that the immunity of the fireman's rule does not extend to one whose willful and wanton misconduct

---

of justice would tolerate any line-drawing that would confer immunity on one who intentionally harmed a fireman. Wantonness is "something less than intentional hurt * * *." *Krauth, supra,* 31 *N.J.* at 277. Nowhere in his twelve-page Complaint does plaintiff charge Carus with *intentional* wrongdoing.

creates the hazard that caused injury to the fireman or police-man." *Ante* at 579.

I endorse the result insofar as it reflects recognition that, at least in the circumstances of this case, the person at fault is *not* entitled to immunity from liability to a fireman injured in the course of fighting the fire. I cannot, however, accept the majority's rationale and standard for imposing such liability, namely, that the misconduct that triggers liability must be "willful and wanton."

The Court's reasoning is curious. It accepts the proposition that the "fireman's rule" is in reality an "immunity." It then observes that "to accord immunity to one who deliberately and maliciously creates the hazard that injures the firemen or policemen stretches the policy underlying the fireman's rule beyond the logical and justifiable limits of its principle." *Ante* at 574. It apparently finds the "limits of its principle" to be tortious conduct that is "negligence." How much worse negligent misconduct must be to go beyond the limits of the immunity is not clear. The majority simply justifies its curtailment of the immunity in this case by equating willful and wanton misconduct to intentional misconduct. It notes, on this point, that "[t]he difference between an intentional act and willful and wanton misconduct is merely one of degree. For an act to be intentional, the actor must intend the harm or realize with substantial certainty that harm is likely to result. For an act to constitute willful and wanton misconduct, the act must be intended, but not the resulting harm; * * *." *Ante* at 574.

The significance of this equation can be found in the Court's opinion in *Berko v. Freda*, 93 *N.J.* 81 (1983). There, hearkening to important *dicta* in *Krauth v. Geller*, 31 *N.J.* 270 (1960), the Court recognized that if "intentional misconduct," is involved in the creation of a fire—that is conduct apart from negligence—this can constitute an "independent cause." An "independent case" of a fire engenders something other than a "normal" or "ordinary risk," which is the probability of harm that arises

only from negligence. Because it is negligence alone, and the normal or ordinary risk of harm flowing from negligence, that is cloaked with an immunity under the firemen's rule, the characterization of tortious conduct as more-than-negligence, and as an "independent cause," by definition generates critical legal consequences. An "independent cause" of the incident that gives rise to injuries to a responding policeman or firefighter performing his duty will not immunize the tortfeasor from liability. Hence, by drawing an analogy between a wanton and willful act and intentional misconduct in this case, the majority, in effect ascribes to a wanton or willful act the quality of an "independent cause." *Ergo*, there will be no immunity for injuries attributable to such wanton or willful conduct.

I can sympathize with the Court in its struggle to find a reasonable explanation for an obviously sound, fair and just result. This case unfortunately exemplifies the hairsplitting that is inevitably occasioned by retaining the fireman's rule and then attempting to identify and articulate the reasons that will credibly distinguish cases in which recovery is allowed from those in which it is denied. While we in the law are conditioned to drawing lines, the majority by its newly-adopted rationale commits courts and juries in these cases to a fate of continuously trying to distinguish "normal" risks from "abnormal" risks from "independent causes." Because of the impossibility of sensibly defining and confining so-called normal risks that police officers and firefighters knowingly and voluntarily assume, I am confirmed in the belief that the willful and wanton misconduct exception, like the "independent cause" exception, is simply a convenient rationalization seized upon to overcome and ameliorate the arbitrary and regressive effects that inhere in the fireman's rule. *See, Berko v. Freda, supra,* 93 *N.J.* at 91, 97 (dissenting opinion). The conundrum that is the "fireman's rule" remains inexplicable and insoluble.

I continue to voice my disagreement with the majority's perception of the public policy that is marshalled to support this

odd immunity. *Berko v. Freda, supra*, 93 *N.J.* at 91 (dissenting opinion). The Court eschews any curtailment of the immunity for the reasons that immunities are disfavored and, in the context of a case such as this, the prevailing common-law rule recognizes liability against a wrongdoer in favor of rescuers responding to an emergency. *Id.* at 100; *Harrison v. Middlesex Water Co.*, 158 *N.J.Super.* 368, 376 (App.Div.1978), rev'd on other grounds, 80 *N.J.* 391 (1979); *Demetro v. Penna R.R.*, 90 *N.J.Super.* 308, 310 (App.Div.1966). The conventional defenses advanced in support of the fireman's rule are feeble. Thus, salary, disability or compensation payments to police and firefighters, as well as other public employees, should not obviate the duty of reasonable care that is owed to them by third-party citizens; and, assuredly such payment is not the equivalent of reasonable compensation for tortiously-inflicted injury. *Berko*, 93 *N.J.* at 94–95.

I noted further in *Berko* that the anomaly of the current fireman's rule is its self-destructive element; the refinements or exceptions spawned by the rule will eventually obscure the rule itself. *Ibid.*, 93 *N.J.* at 97 n. 3. *See, e.g., Lipson v. Superior Court of Orange Cty.*, 31 *Cal.*3d 362, 644 *P.*2d 822, 182 *Cal.Rtpr.* 629 (Sup.Ct.1982). The rule draws artificial distinctions between police officers and firefighters who are denied recovery under the fireman's rule and other public employees who have the right to maintain traditional tort actions against third parties for virtually all negligently inflicted injuries arising in the performance of their employment. And, as noted, this case attaches extraordinary legal consequences to the refinement that separates conduct that is negligent (or presumably grossly negligent) and that which is wanton or willful. The exception fashioned in this case exhibits the voracious tendency of the rule to devour itself and is a further argument for sweeping away its truncated remains.

This point obviously is not lost upon Justice Clifford, who extrudes the peculiarities suggested by the Court's newly-honed fireman's rule. *Ante* at 585. The majority, he points

out, is creating a system under which two police officers or two firefighters who sustain identical injuries may receive uneven treatment and compensation due to the difference in the conduct that caused the hazard to which they were exposed. I agree with Justice Clifford that this distinction is illogical. Further, from my point of view, the distinction impedes the effectuation of a fundamental tenet of our jurisprudence that should apply to firefighters and policemen: the right of redress for those injured as a result of the wrongdoing of others.

For these reasons, I dissent.

*For reversal and remandment* —Chief Justice WILENTZ and Justices POLLOCK, O'HERN, GARIBALDI and STEIN— 5.

*Opposed*—Justices CLIFFORD and HANDLER—2.