266 N.J. Super. 599 (1993)
630 A.2d 368
MICHAEL CRAWN, PLAINTIFF-APPELLANT AND CROSS-RESPONDENT,
v.
JOHN CAMPO, DEFENDANT-RESPONDENT AND CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 31, 1993.
Decided July 30, 1993.
*600 Before Judges GAULKIN, STERN and BROCHIN.
Albert E. Fershing, argued the cause for Michael Crawn (Shurkin & Fershing, attorneys).
*601 James M. DeMarzo, argued the cause for John Campo (O'Donnell, McCord, Helfrich & Bangiola, attorneys).
The opinion of the court was delivered by GAULKIN, P.J.A.D.
Plaintiff Michael Crawn, playing catcher in a pick-up softball game, was injured in a collision at home plate with defendant John Campo, an opposing baserunner. Crawn brought this action for damages, alleging that Campo (1) "negligently ran into" him, (2) "violently slid into home plate ... in violation of the rules and regulations of the game" and (3) ran into him "willfully and maliciously and with intent to harm." The allegation of intentional harm was withdrawn and, following a liability-only trial, the jury found that Campo acted "in reckless disregard of the safety of [Crawn]." The trial judge granted a new trial, R. 4:49-1(a), and, in a separate order, directed that at the retrial "the standard of care to be proven by the plaintiff [again] must be ... reckless conduct rather than ... simple negligence." By leave granted, R. 2:2-4, Crawn appeals from both of those orders; Campo cross-appeals from the denial of his motion to dismiss the action because of Crawn's failure to present expert testimony.

I
We affirm the new trial order. The trial judge was correct in concluding that Campo's attorney was wrongly precluded from confronting witness Patruno with his prior inconsistent statement and that Crawn's attorney improperly referred to the injuries Crawn suffered. Our review of the record satisfies us that those errors could well have affected the jury's determinations. We accordingly defer to the trial judge's decision to order the new trial. See Lanzet v. Greenberg, 126 N.J. 168, 175, 594 A.2d 1309 (1991).
We reject as clearly without merit Campo's cross-appeal contention that Crawn's cause of action should have been dismissed *602 because of his failure to present expert testimony. R. 2:11-3(e)(1)(E). See Butler v. Acme Markets, Inc., 89 N.J. 270, 283-284, 445 A.2d 1141 (1982).

II
The Law Division judge held that, as between players "in a sporting event such as a softball game,"
only those injuries caused by intentional conduct or by acting in reckless disregard of the safety of others will give rise to a cause of action. Liability will not be found to exist where ordinary negligence caused the injuries.
[Crawn v. Campo, 257 N.J. Super. 374, 377, 608 A.2d 465 (Law Div. 1992).]
That ruling is the underpinning of the order directing that at the new trial Crawn must prove "reckless conduct rather than ... simple negligence." We reverse, for we are persuaded that ordinary negligence is the appropriate standard to be applied.
The issue has not previously been addressed in New Jersey.[1] The trial judge relied on "the great weight of case authority in the various states," which he read as requiring proof of reckless or intentional conduct in sports-injury cases.[2]Ibid. Other courts *603 have similarly described the case law. See, e.g., Gauvin v. Clark, 404 Mass. 450, 537 N.E.2d 94, 97 (1989) ("[t]he majority of jurisdictions which have considered this issue have concluded that personal injury cases arising out of an athletic event must be predicated on reckless disregard of safety"); Marchetti v. Kalish, 53 Ohio St.3d 95, 97, 559 N.E.2d 699, 701 ("courts generally allow a cause of action for injuries sustained in recreational or sports activities only under reckless or intentional tort theories"), reh'g denied, 54 Ohio St.3d 716, 562 N.E.2d 163 (1990). Indeed, the only case unequivocally adopting ordinary negligence as the sports-activity standard of care is the recent 4-3 decision of the Wisconsin Supreme Court in Lestina v. West Bend Mut. Ins. Co., 176 Wis.2d 901, 501 N.W.2d 28 (1993). In our view, the rationale of the cases expressing the majority rule is at odds with relevant New Jersey precedent and policy.

III
The early sports-injury cases permitted recovery upon a showing of ordinary negligence. See, e.g., Polk v. Trinity Universal Ins. Co., 115 So.2d 399 (La. Ct. App. 1959) (10-year old defendant liable for negligent failure to make proper observation of nearby children before swinging a bat); Carey v. Toles, 7 Mich. App. 195, 151 N.W.2d 396 (1967) (new trial ordered to determine negligence and contributory negligence where plaintiff was struck by bat in a pick-up softball game); Niemczyk v. Burleson, 538 S.W.2d 737 (Mo. Ct. App. 1976) (sustaining a complaint alleging that plaintiff, a base runner in a softball game, negligently collided with plaintiff in the base path). The requirement of a showing of reckless or intentional misconduct appears to have been first expressed in Nabozny v. Barnhill, 31 Ill. App.3d 212, 334 N.E.2d 258 (1975). The court there justified its ruling as necessary "to control a new field of personal injury litigation" and to assure that "the law ... not place unreasonable burdens on the free and vigorous participation in sports by our youth." Id., 334 N.E.2d at 260. Other courts have stated the same reasoning and result. In Ross v. *604 Clouser, 637 S.W.2d 11 (Mo. 1982), for example, the Missouri Supreme Court relied on Nabozny in overruling Niemczyk, supra:
Fear of civil liability stemming from negligent acts occurring in an athletic event could curtail the proper fervor with which the game should be played and discourage individual participation, yet it must be recognized that reasonable controls should exist to protect the players and the game. Balancing the seemingly opposite interests, we conclude that a player's reckless disregard for the safety of his fellow participants cannot be tolerated. If a plaintiff pleads and proves such recklessness, he may seek relief for the injuries incurred in an athletic competition.
[Id. at 14.]
See also Marchetti, supra, 559 N.E.2d at 703 ("our goal is to strike a balance between encouraging vigorous and free participation in recreational or sports activities, while ensuring the safety of the players"); Gauvin, supra, 537 N.E.2d at 96 ("courts are wary of imposing wide tort liability on sports participants, lest the law chill the vigor of athletic competition"); Kabella v. Bouschelle, 100 N.M. 461, 672 P.2d 290, 294 (1983) ("[v]igorous and active participation in sporting events should not be chilled by the threat of litigation"). But see Lestina, supra, 501 N.W.2d at 32 ("[w]e do not agree that the application of the negligence standard would have this effect [of discouraging participation in sports-related activities]").
The cases also commonly offer "assumption of risk" to justify denying recovery for negligently caused sports injuries. Kabella, supra, is representative:
Voluntary participation in [an athletic contest] constitutes an implied consent to normal risks attendant to bodily contact permitted by the rules of the sport.
[672 P.2d at 292.]
See also, e.g., Marchetti, supra, 559 N.E.2d at 703-04 ("where individuals engage in recreational or sports activities, they assume the ordinary risks of the activity"); Connell v. Payne, 814 S.W.2d 486, 488-89 (Tex. Ct. App. 1991) ("[a] participant in a competitive contact sport expressly consents to and assumes the risk of the dangerous activity by voluntarily participating in the sport"); Overall v. Kadella, 138 Mich. App. 351, 361 N.W.2d 352, 355 (1984) *605 ("[p]articipation in a game involves a manifestation of consent to those bodily contacts which are permitted by the rules of the game").
Under that analysis, reckless or intentional misconduct is actionable because it is "totally outside the range of the ordinary activity involved in the sport." Knight v. Jewett, 3 Cal.4th 296, 11 Cal. Rptr.2d 2, 17, 834 P.2d 696, 711 (1992); see also Turcotte v. Fell, 68 N.Y.2d 432, 510 N.Y.S.2d 49, 502 N.E.2d 964, 970 (1986) (sports participant does not "consent" to "flagrant infractions unrelated to the normal method of playing the game and done without any competitive purpose"). But only a few courts have examined the proposition that a participant in a sporting contest "assumes the risk" of another participant's negligence. In so doing, they have demonstrated how the notion of assumption of risk "bedevils the law." Tiller v. Atlantic Coast Line R.R. Co., 318 U.S. 54, 68, 63 S.Ct. 444, 452, 87 L.Ed. 610, 618 (1943) (Frankfurter, J., concurring). As pointed out by Justice Mosk, concurring and dissenting in Knight, supra, discussion of assumption of risk invites analysis of such "esoteric terms" and "abstruse distinctions" as primary assumption of risk, secondary assumption of risk, reasonable implied assumption of risk, unreasonable implied assumption of risk, implied secondary reasonable assumption of risk and implied secondary unreasonable assumption of risk. 834 P.2d at 712-13; see also Turcotte, supra, 502 N.E.2d at 967-70 (discussing express assumption of risk, primary assumption of risk, secondary assumption of risk, consent and waiver); Kuehner v. Green, 436 So.2d 78, 79-81 (Fla. 1983) (discussing express assumption of risk, waiver, voluntary consent, actual consent and subjective appreciation of risk). The results of those explorations have been equivocal: Knight and Turcotte found as a matter of law that a sports participant assumes the risk of negligent injury at the hands of a co-participant, while Kuehner concluded that the jury should determine whether the participant "actually consented" to confront the danger.

*606 IV
"Assumption of risk" is not a sound basis for incorporating a sports-injury immunity in New Jersey law. The concept of assumption of risk was essentially written out of our jurisprudence by Meistrich v. Casino Arena Attractions, Inc., 31 N.J. 44, 155 A.2d 90 (1959). Speaking through Chief Justice Weintraub, the Supreme Court there noted "two distinct meanings" of assumption of risk: "primary" assumption of risk, "an alternate expression for the proposition that defendant was not negligent, i.e., either owed no duty or did not breach the duty owed," and "secondary" assumption of risk, "an affirmative defense to an established breach of duty." Id. at 48-49, 155 A.2d 90. Based on his analysis of those separate concepts, Chief Justice Weintraub concluded that "there is no reason to charge assumption of risk in its secondary sense as something distinct from contributory negligence." Moreover, with respect to its "primary" sense,
it will not matter whether a trial court makes or omits a reference to assumption of the risk, provided that if the terminology is used the jury is plainly charged it is merely another way of expressing the thought that a defendant is not liable in the absence of negligence; that a plaintiff does not assume a risk defendant negligently created....
[Id. at 55, 155 A.2d 90.]
That holding was emphatically reaffirmed in McGrath v. American Cyanamid Co., 41 N.J. 272, 276, 196 A.2d 238 (1963):
In Meistrich v. Casino Arena Attractions, Inc., 31 N.J. 44, 155 A.2d 90 (1959), we pointed out that assumption of the risk was theretofore used in two incongruous senses: in one sense it meant the defendant was not negligent, while in its other sense it meant the plaintiff was contributorily negligent. We said that in truth there are but two issues  negligence and contributory negligence  both to be resolved by the standard of the reasonably prudent man, and that it was erroneous to suggest to the jury that assumption of the risk was still another issue.
It was our hope that after Meistrich the bench and bar would focus upon the true issues, but unhappily some cling to the terminology of assumption of risk and continue to be misled by it even while purporting to think of it as merely a convertible equivalent of negligence or contributory negligence.
*607 The Court directly withdrew the suggestion it made in Meistrich that a jury charge of primary assumption of risk might "perhaps ... aid comprehension," 31 N.J. at 54, 155 A.2d 90:
Experience, however, indicates the term "assumption of risk" is so apt to create mist that it is better banished from the scene. We hope we have heard the last of it. Henceforth let us stay with "negligence" and "contributory negligence."
[McGrath, supra, 41 N.J. at 276, 196 A.2d 238.]
The emptiness of the assumption of risk concept is demonstrated here. Contact sports unquestionably involve risk. Voluntary participants accordingly might be said to "assume" the "normal" or "ordinary" risks of the contest, Marchetti, supra, 559 N.E.2d at 703-04; Connell, supra, 814 S.W.2d at 488-89, but not those risks that are "outside the range of the ordinary activity involved in the sport." Knight, supra, 834 P.2d at 711. Those commonsense propositions can be fully expressed, however, in ordinary negligence terms. A co-participant who creates only risks that are "normal" or "ordinary" to the sport acts as a "reasonable [person] of ordinary prudence under the circumstances." Ambrose v. Cyphers, 29 N.J. 138, 144, 148 A.2d 465 (1959). If the co-participant creates an unreasonably great risk, he is negligent. Bohn v. Hudson & Manhattan R.R. Co., 16 N.J. 180, 186, 108 A.2d 5 (1954). Assumption of risk does nothing except obfuscate the analysis by wrongly suggesting that a sports participant can or should be barred from recovery without regard to ordinary negligence principles. McGrath, supra, 41 N.J. at 276, 196 A.2d 238.

V
New Jersey courts have also commonly rejected policy justifications of the kind relied on by the out-of-state cases in support of their grant of immunity from liability for negligently-caused sports injuries. We have consistently recognized and applied "the fundamental principle that liability ordinarily should be imposed upon those who wrongfully injure others." Foldi v. Jeffries, 93 N.J. 533, 544, 461 A.2d 1145 (1983). Accordingly, rather than creating new tort immunities, our Supreme Court has generally narrowed *608 and abrogated longstanding common-law immunities. See, e.g., id. at 551, 461 A.2d 1145 (abrogating parent-child immunity except in limited "special situations"); Merenoff v. Merenoff, 76 N.J. 535, 388 A.2d 951 (1978) (abrogating interspousal tort immunity); P, T & L Constr. Co. v. Commissioner, Dep't of Transp., 55 N.J. 341, 262 A.2d 195 (1970) (abolishing state governmental immunity); Jackson v. Hankinson, 51 N.J. 230, 238 A.2d 685 (1968) (abolishing local governmental immunity); Collopy v. Newark Eye & Ear Infirmary, 27 N.J. 29, 141 A.2d 276 (1958) (abolishing tort immunity of charitable institutions).
Merenoff is representative and particularly germane. The Court there evaluated the purported justifications for the doctrine of interspousal immunity. First, it reasoned that "the potential danger to marital tranquility posed by the availability of a legal action for personal injuries based on negligence between spouses" was not a sound basis for denying relief because "the choice to sue, or not to sue, should be that of the parties to the marriage." 76 N.J. at 552, 388 A.2d 951. Second, the Court had "no doubt that our courts have at their command ample means to cope with the real or asserted spectre of fraud in the context of marital tort claims." Id. at 554, 388 A.2d 951. Third, the Court found that the potential danger of "frivolous, picayune or inflated claims of marital, personal injury ... is met most efficaciously by defining and delineating marital conduct which cannot and should not be the basis for tort litigation." Id. at 555, 388 A.2d 951. The ensuing discussion is particularly noteworthy:
There is a range of activity arising in the course of a marriage relationship beyond the reach of the law of torts. Special matters of privacy and familiarity may be encompassed by a marital or nuptial privilege and fall outside the bounds of a definable and enforceable duty of care. Certain conduct may also be regarded as "consensual", involving the "give-and-take" and subtle ebb and flow of married life. In these areas courts and juries cannot be expected to grasp sensibly and consistently the acceptable norm of married living or chart the parameters of reasonable marital behavior as a predicate for affixing liability in tort. Immer v. Risko, supra, 56 N.J. [482] at 495 [267 A.2d 481 (1970)]; cf. Small v. Rockfeld, supra, 66 N.J. [231] at 244 [330 A.2d 335 (1974)]; Note, supra, 79 Harv.L.Rev. at 1656.

*609 Similarly, certain kinds of claimed injuries between married persons will be based on simple domestic carelessness arising from activities which partake of the everyday exigencies of regular household existence and, for that reason, may not readily be controlled or influenced by the law of torts through the judicial imposition of a duty of care and the corresponding obligation to respond in damages for its breach. Cf. Small v. Rockfeld, supra. Thus, absent the immunity bar, the fear that trivial, exaggerated or unrealistic claims for personal injury will be brought by married persons is counterpoised by the realization that such claims for the most part will not be cognizable by courts or rewarded by juries.
* * * * * * * *
We do not discern against this background a need to adopt a special standard of care different from the ordinary duty of reasonable care under all the circumstances. In effect the ordinary standard of care as between married people, correct and fairly applied, will reflect the root fact and realities of married life. It is because spouses enjoy mutual liberties with one another and share jointly certain risks in their own lives together, that the ordinary standard of care applied in the marital context should enable a trier of fact to differentiate qualitatively between the conduct of married and unmarried persons and to recognize that certain behavior as between a married couple is acceptable and reasonable, even though such conduct might well be considered unreasonable and result in liability if engaged in by unmarried persons.
[Merenoff, supra, 76 N.J. at 555-56, 559, 388 A.2d 951.]
In sum, Merenoff held that a blanket interspousal immunity is unnecessary and unjust, that the ordinary negligence standard of care should apply and that inappropriate or unwarranted claims should be weeded-out "by defining and delineating marital conduct which cannot and should not be the basis for tort litigation." Id., at 555, 338 A.2d 951.
That analysis is relevant and persuasive here. The question before us is whether a sports participant should be immune from liability for negligence. Cf. Mahoney v. Carus Chem. Co., Inc., 102 N.J. 564, 572, 510 A.2d 4 (1986) ("fireman's rule" immunizes negligent conduct by permitting tort recovery only upon a showing of intentional or wilful and wanton misconduct). The purported policy justification for such an immunity  to assure that vigorous participation in sports activities is not restrained by fear of civil liability  is hardly compelling. Our law does not generally regard the prospect of ordinary tort liability as inhibiting *610 socially useful activities. Our courts have not found it necessary to grant immunity, for example, for negligence of governmental agencies, charitable organizations, social hosts or gratuitous volunteers. See, e.g., P, T & L Constr. Co., supra, 55 N.J. 341, 262 A.2d 195; Collopy, supra, 27 N.J. 29, 141 A.2d 276; Berger v. Shapiro, 30 N.J. 89, 152 A.2d 20 (1959); O'Neill v. Suburban Terrace Apartments, Inc., 110 N.J. Super. 541, 266 A.2d 304 (App.Div.), certif. denied, 57 N.J. 138, 270 A.2d 40 (1970). The core common-law principle that "there should be reparation for wrongful injury," Merenoff, supra, 76 N.J. at 547, 388 A.2d 951, would have no meaning if it could be overcome by the ever-present inference that fear of liability may dissuade people from engaging in otherwise useful conduct. Cf. Lestina, supra, 501 N.W.2d at 32. And, to the extent that a sports-injury immunity is regarded as necessary to avoid frivolous or inflated claims arising out of "the usual incidents of competition resulting from carelessness," Turcotte, supra, 510 N.Y.S.2d at 55, 502 N.E.2d at 970, the Merenoff response is entirely apt: that danger "is met most efficaciously by defining and delineating ... [the] conduct which cannot and should not be the basis for tort litigation," 76 N.J. at 555, 388 A.2d 951. See also People Express Airlines, Inc. v. Consolidated Rail, 100 N.J. 246, 254, 495 A.2d 107 (1985):
The answer to the allegation of unchecked liability is not the judicial obstruction of a fairly grounded claim for redress. Rather, it must be a more sedulous application of traditional concepts of duty and proximate causation to the facts of each case.
We find only two settings in which New Jersey courts have recognized a negligence immunity of the kind urged here. Foldi, supra, abrogated the doctrine of parent-child immunity "except in special situations that involve the exercise of parental authority and customary child care," as to which recovery is permitted "where the parent's inadequate supervision rises to the level of wilful or wanton misconduct." 93 N.J. at 551, 461 A.2d 1145. But that ruling represented a substantial narrowing of the common-law immunity. Moreover, although Foldi speaks of a limited "immunity," the Court characterized its holding as "consistent *611 with our decision in Merenoff to retain interspousal immunity for acts of `simple domestic carelessness.'" Id. at 550, 461 A.2d 1145. As we have pointed out, Merenoff did not preserve any interspousal immunity but rather indicated that questions of "simple domestic carelessness" should be dealt with by appropriate tailoring of the governing standard of care, i.e., "delineating marital conduct which cannot and should not be the basis for tort litigation." Merenoff, supra, 76 N.J. at 555, 388 A.2d 951. The practical effect of the Foldi ruling is no different. Cf. Murray v. Shimalla, 231 N.J. Super. 103, 555 A.2d 24 (App.Div. 1989).
The second arguable New Jersey precedent in support of a sports-injury immunity is our "fireman's rule," which permits firefighters and police officers to recover for injuries arising from hazards "incidental to and inherent in the performance of" their duties only upon a showing of intentional or wilful and wanton misconduct. Rosa v. Dunkin' Donuts, 122 N.J. 66, 76, 583 A.2d 1129 (1991). That rule "is grounded almost exclusively in policy considerations, decked out a bit in the garb of common-law principles of duty and assumption of risk." Mahoney, supra, 102 N.J. at 583, 510 A.2d 4 (Clifford, J., dissenting in part). Those policy considerations derive from the special roles and duties of public safety employees and the correlative rights and expectations of citizens who pay for and are entitled to those essential public services. See, e.g., Krauth v. Geller, 31 N.J. 270, 274, 157 A.2d 129 (1960); Berko v. Freda, 93 N.J. 81, 88-89, 459 A.2d 663 (1983). In our view, those concerns of public policy are sui generis; they offer no persuasive support for a rule of immunity in sports-injury cases.[3]

*612 VI
We thus find no sound reason to immunize sports participants from liability for their negligent conduct.[4] To the contrary, New Jersey authorities persuade us that there is every reason to reject such an immunity. A person participating in sports activities can properly be required to act as a "reasonable [person] of ordinary prudence under the circumstances." Ambrose, supra, 29 N.J. at 144, 148 A.2d 465. The application of that standard in the setting of a sports event cannot be abstractly described or defined. As the Supreme Court held with respect to interspousal torts, determinations as to what claims will and will not justify recovery of damages "are best left to be defined and developed on a case-by-case basis." Merenoff, supra, 76 N.J. at 557, 388 A.2d 951. Needless to say, the mere occurrence of an injury in a sports activity does not betoken negligence. Among the factors that might bear on the issue of reasonable care in a sports event are: what sport was involved; whether it was a professional game or an amateur contest; what equipment was involved in the sport, and what was its purpose; whether the sport was conducted pursuant to a recognized set of rules, an informal set of rules, or no rules at all; whether the injurious conduct violated a rule of the contest and, if so, whether the rule was designed for the participants' safety; what was the ultimate purpose of the game and what were the customary methods of winning it; what were the ages, physical characteristics and skills of the participants; what knowledge of the rules and customs of the game the participants *613 possessed; what degree of competitiveness the activity involved; and what relationship the participants' conduct bore to the ultimate purpose of the contest. Cf. Niemczyk, supra, 538 S.W.2d at 741-42; Turcotte, supra, 502 N.E.2d at 969; Lestina, supra, 501 N.W.2d at 33.
The factfinder  ordinarily the jury  is to determine whether negligence has been proved, but the court may withdraw the case from the jury if it determines that the defendant's conduct could not reasonably be found negligent. Restatement (Second) of Torts § 285(d) and § 285 comment e (1965); cf. Carrigan v. Roussell, 177 N.J. Super. 272, 278-79, 426 A.2d 517 (App.Div. 1981) (golfer liable for negligently driving a ball; necessity and adequacy of warning to others were for jury determination). The trial judge thus retains authority to determine whether particular conduct in a sports setting should be regarded as "acceptable and reasonable" as a matter of law. Cf. Merenoff, supra, 76 N.J. at 559, 388 A.2d 951. And, as in other areas of developing tort law, the standard of care in sports-injury cases may ultimately be defined by a series of appellate decisions:
[T]he decision of an appellate court controls the action of trial courts and juries in all identical or closely similar cases. To the extent that the decision declares particular conduct to be up to or below the socially required standard, it defines the conduct of the reasonable man and narrows the field in which the opinion of the trial judge or jury is operative. Occasionally a situation occurs so often that a series of appellate decisions deals with so much of the customary conduct of both parties as to afford a fairly exhaustive definition of the conduct of reasonable men in such situations.
[Restatement (Second) of Torts § 285 comment e (1965); Ambrose, supra, 29 N.J. at 145-46, 148 A.2d 465.]
The order granting a new trial is affirmed. The order requiring proof of "reckless conduct rather than ... simple negligence" is reversed. The matter is remanded to the Law Division for a new trial consistent with this opinion.
NOTES
[1] The trial judge noted, but properly drew no guidance from, Thomas v. Barlow, 5 N.J. Misc. 764, 138 A. 208 (Sup.Ct. 1947). Plaintiff there alleged an intentional assault during a basketball game; the court set aside the $3000 jury award because the "great preponderance of the evidence" showed that the blow was "entirely accidental." The court thus held only that the plaintiff had failed to prove his allegation of intentional injury, not that an accidental injury would not be actionable.
[2] We recognize, but need not address, the many difficulties in defining a "sports injury." Certainly the term includes an injury caused and sustained, as here, by co-participants in a competitive contact sport. Cf. Knight v. Jewett, 3 Cal.4th 296, 11 Cal. Rptr.2d 2, 17 n. 17, 834 P.2d 696, 711 n. 7 (1992). The cases generally accept that ordinary negligence principles apply to claims by sports participants and spectators against landowners, sponsors, employers, trainers and other non-participants, and also to at least some claims against co-participants in non-contact sports. See, e.g., Kabella v. Bouschelle, 100 N.M. 461, 672 P.2d 290, 294 (1983); Goss v. Allen, 70 N.J. 442, 360 A.2d 388 (1976) (skiing injury); Carrigan v. Roussell, 177 N.J. Super. 272, 426 A.2d 517 (App.Div. 1981) (golfing injury); Fantini v. Alexander, 172 N.J. Super. 105, 410 A.2d 1190 (App. Div. 1980) (karate injury).
[3] The winding and contentious evolution of the fireman's rule also illustrates the difficulty of adopting and delimiting a tort immunity. See, e.g., Rosa, supra, 122 N.J. at 77-86, 583 A.2d 1129 (Handler, J., dissenting); Mahoney, supra, 102 N.J. at 583-87, 510 A.2d 4 (Clifford, J., dissenting in part); Lees v. Lobosco, 265 N.J. Super. 95, 625 A.2d 573 (App.Div. 1993); Knoetig v. Hernandez Realty Co., 255 N.J. Super. 34, 604 A.2d 619 (App.Div.), certif. denied, 130 N.J. 394, 614 A.2d 617 (1992).
[4] We recognize, of course, that the Legislature can grant, and has granted, immunity in particular settings. See, e.g., N.J.S.A. 2A:62A-6 to -6.2 (volunteer athletic coaches, managers, officials and sponsors of non-profit sports teams); N.J.S.A. 24:4A-3 (food donors and food banks); N.J.S.A. 2A:53A-7 to -8 (charitable organizations); N.J.S.A. 2A:53A-12 to -13.1 (volunteer fire companies, first aid squads, rescue squads and emergency squads and their members); N.J.S.A. 2A:62A-1 (persons rendering aid at the scene of an accident or emergency); N.J.S.A. 59:2-1 to -10 (public entities); N.J.S.A. 59:3-1 to -14 (public employees). Cf. N.J.S.A. 5:13-5 to -6 (assumption of risk a defense to suit against ski area operators).