APPEL, Justice
(concurring in part and dissenting in part).
This case raises two substantive issues. The first substantive issue is whether there is a special limited-duty rule for contact sports under Iowa law that applies to the game of softball. If so, a second question arises, namely, whether the contact-sports exception should prevent liability based on negligence under the facts and circumstances of this case.
For the reasons stated below, I would reject application of the contact-sports exception to softball. In the alternative, I would hold that there is a factual question regarding whether the conduct in this case was outside the scope of the ordinary risks of softball and, therefore, subject to liability based on negligence.
I. Matters Properly Before the Court.
In the proceedings below, the plaintiff framed the argument narrowly as to whether the game of softball falls within the contact-sports exception. In making this argument, the plaintiff clearly and indisputably has maintained the case should be tried as an ordinary negligence claim. The plaintiff, however, did not argue that the contact-sports exception should be eliminated altogether. The question thus arises whether it is proper for the court to address the larger question in this appeal.
The question of when an issue not argued by the parties should be decided by the court involves a number of consider *83 ations. Although sometimes discussed in a conclusory fashion as involving “issue preservation” or “waiver,” the field is, in fact, considerably more nuanced.
On the one hand, the judicial process is normally driven by the parties. They bring their cases to the court and ask the court to decide the issues they present. Judges are not advocates who reach out to decide questions the parties themselves either deem unimportant or, for whatever reasons, fail to raise. The job of the court is to decide concrete cases the parties bring to it.
On the other hand, judges should not allow the parties’ framing of the issues to usurp the judicial function. The courts, and not the parties, are responsible for the coherent development of law. This is particularly true when courts are performing their common law function. A judicially-driven decision may produce a more accurate statement of law. Amanda Frost, The Limits of Advocacy, 59 Duke L.J. 447, 452 (2009) [hereinafter Frost]. The courts are not some kind of private arbitration service working for the parties and no one else. Id. at 474.
It is the tension between these two roles of deciding cases and developing the law that must be resolved in this case when we consider whether to address the ongoing validity of the contact-sports exception when the parties have declined to expressly address it in their briefs. See generally Chad M. Oldfather, Defining Judicial In-activism: Models of Adjudication and the Duty to Decide, 94 Geo. L.J. 121, 164-75 (2005) (discussing the scope of a court’s adjudicative duty).
The United States Supreme Court has addressed this kind of question by distinguishing between a claim and an argument. As noted by Sarah Cravens, the Supreme Court has made it clear that once a claim is properly presented, a party is not limited to arguments presented below. Sarah M.R. Cravens, Involved Appellate Judging, 88 Marq. L.Rev. 251, 259 (2004) [hereinafter Cravens]; see also Lebron v. Nat’l R.R. Passenger Corp., 513 U.S. 374, 378-83, 115 S.Ct. 961, 964-67, 130 L.Ed.2d 902, 909-12 (1995). Further, the Court has emphasized that it “is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.” Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99, 111 S.Ct. 1711, 1718, 114 L.Ed.2d 152, 166 (1991). Whether to exercise this independent power is said to be a question of prudence. U.S. Nat’l Bank of Or. v. In-dep. Ins. Agents of Am., Inc., 508 U.S. 439, 446-47, 113 S.Ct. 2173, 2178, 124 L.Ed.2d 402, 412-13 (1993).
The Supreme Court has been willing to employ this flexible, discretionary approach to determining whether it should decide an issue not argued by the parties in several important cases. For example, in Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the United States Supreme Court overruled Swift v. Tyson, 16 Pet. 1, 41 U.S. 1, 10 L.Ed. 865 (1842), even though neither party argued that it should be overturned. Frost, 59 Duke L.J. at 450. In Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the Supreme Court held that the constitution prohibited only intentional discrimination although both parties indicated that it barred disparate racial impact. Id. In Dickerson v. United States, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), the Supreme Court considered the question of whether a statute governing the admission of confessions displaced Miranda even though the question was not raised by the parties. Id.
The leading commentator on Supreme Court practice has stated that the decision *84 to confront a question not raised by the petition for certiorari “ ‘is not circumscribed by any particular formula’ ” and “ ‘reflects the Court’s discretionary authority to dispose of cases in what it determines to be the most sensible and reasonable way.’ ” Id. at 463, 120 S.Ct. 2326 (quoting Robert L. Stern et al., Supreme Court Practice 346 (7th ed.1993)). While the Supreme Court has stated that it “ordinarily” does not consider questions outside the certiorari petition, the practice is “prudential,” not jurisdictional. See Yee v. City of Escondido, 503 U.S. 519, 535, 112 S.Ct. 1522, 1532-33, 118 L.Ed.2d 153, 170 (1992); Blonder-Tongue Labs. v. Univ. of Ill. Found., 402 U.S. 313, 320 n. 6, 91 S.Ct. 1434, 1439 n. 6, 28 L.Ed.2d 788, 794-95 n. 6 (1971) (stating that the rule “does not limit our power to decide important questions not raised by the parties.”). On occasion, the Supreme Court orders supplemental briefing by the parties or amici. Cravens, 88 Marq. L.Rev. at 268.
High courts in other states have, from time to time, been willing to consider arguments not raised by the parties. Every law student studies the famous case of MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050 (1916). In that case, the plaintiff sought to sue an automobile manufacturer for an allegedly defective vehicle. MacPherson, 111 N.E. at 1051. Under existing law, however, the doctrine of privity barred the plaintiff from bringing a claim against the manufacturer, with whom the plaintiff had no direct contact, unless the plaintiff could show that the automobile was “inherently dangerous.” Id. As a result, the plaintiff argued that an automobile was “inherently dangerous.” Id.
Justice Cardozo did not address the narrow argument made by the plaintiff. Instead, after canvassing the applicable law, Cardozo held that the larger doctrine which required privity of contract for a purchaser to bring a claim against a manufacturer was no longer good law. Id. at 1053. According to Cardozo, “We have put aside the notion that the duty to safeguard life and limb, when the consequence of negligence may be foreseen, grows out of contract and nothing else.” Id.
Although Iowa courts are not governed by the “case or controversy” restrictions in Article III of the United States Constitution, we have held that a plaintiff may not raise a new theory of liability after trial. See, e.g., Field v. Palmer, 592 N.W.2d 347, 351 n. 1 (Iowa 1999); Shill v. Careage Corp., 353 N.W.2d 416, 420 (Iowa 1984); Gosha v. Woller, 288 N.W.2d 329, 331 (Iowa 1980). Our cases, however, are generally not inconsistent with the approach of the United States Supreme Court distinguishing between a claim, which must be raised below and argued in briefs on appeal, and an argument in support of a preserved claim.
Indeed, we have been willing to relax ordinary rules of issue preservation based on notions of judicial economy and efficiency. For example, we may decide eviden-tiary questions not presented to the district court where we reverse a decision of the district court but the record reveals an alternate ground for admission of the evidence. DeVoss v. State, 648 N.W.2d 56, 60-63 (Iowa 2002).
We have also stated that we will address issues that are “incident” to a determination of other issues properly presented. Presbytery of Se. Iowa v. Harris, 226 N.W.2d 232, 234 (Iowa 1975). In this case, it seems to me, the issues here are so intertwined — namely, whether the contact-sports exception should be embraced and whether a contact-sports exception should apply in softball, that there is no insurmountable obstacle to our consideration of the larger issue.
*85 In summary, we are not confronted with a case where the issue — whether the plaintiff may proceed with a cause of action based on negligence — was not raised or ruled upon by the district court. The case thus does not fall within the hardcore area where arguments on appeal should rarely, if ever, be entertained. Nor is this a case where the factual record developed below is inadequate, thereby preventing meaningful appellate review.
On the other hand, there are some good reasons to consider the larger question. This case is a classic example of intertwined issues. It is one thing to decline to address an issue not raised where orderly development of the law is not affected, but it is quite another thing to refuse to consider the policy underpinnings of a doctrine while at the same time extending it into new and uncharted territory.
Because the parties chose to present only the narrow argument that the contact-sports exception should not be extended to softball, the majority sees itself as locked into the contact-sports doctrine and has no choice but to extend it outside the context previously established by Iowa case law even though there is a substantial question regarding its ongoing validity. I regard this approach as ceding the court’s fundamental authority to develop the law to the parties. See Frost, 59 Duke L.J. at 472 (arguing that litigants should not wrest away from courts the interpretation of law). Yet, while refusing to consider the validity of the underlying doctrine, the court at the same time considers the question of whether the contact-sports doctrine is consistent with the Restatement (Third) of Torts: Liability for Physical and Emotional Harm, an issue that, like the question of the continued validity of the contact-sports exception, was not briefed by the parties.
Further, because public policy is at the heart of the contact-sports exception, this case presents the kind of dispute that even Professor Eisenberg, who generally endorses the adversary or participatory model of adjudication, believes justifies the relaxation of the ordinary rules. See generally Melvin Aron Eisenberg, Participation, Responsiveness, and the Consultative Process: An Essay for Lon Fuller, 92 Harv. L.Rev. 410 (1978). Indeed, under the Restatement (Third) of Torts, the contact-sports exception, as a special rule to ordinary negligence, can only be adopted if there are compelling public policies in support of the special rule. Further, in common law cases, courts must make decisions on grounds of policy because of their implications for future cases. Craven, 88 Marq. L.Rev. at 255.
In any event, if there is a reluctance to address the broader question because of the failure of the parties to make this argument, we should order the parties to file supplemental briefs to address the issue rather than render an opinion based on what may prove to be a fatally flawed premise. There is no reason not to order supplemental briefs in order to ensure that this court “gets it right” now rather than wait for an additional case to come along. Supplemental briefing would also promote fairness to the parties by ensuring that they have an opportunity to weigh in on the larger issue. See Adam A. Milani & Michael R. Smith, Playing God: A Critical Look at Sua Sponte Decisions by Appellate Courts, 69 Tenn. L.Rev. 245, 287 (2002) (advocating that when courts use discretion to decide issues not raised by parties, supplemental briefing should be requested to avoid abuse of discretion).
I would have ordered the parties to present supplemental briefing on the larger issues presented in this case. Since such briefing has not been ordered, the *86 ease must be decided as is in a less than optimum posture. Nonetheless, I am convinced that there is ample' reason not to extend the contact-sports exception to this case for the reasons expressed below.
Before discussing my views on the merits, it is important to note what this ease means. The continued validity of the contact-sports exception and its viability and scope under the Restatement (Third) of Torts are no.t addressed by a majority of the members of the court and therefore remain open questions. The court may have reached a result on this appeal, but it has left the law in this area murky and uncertain.
II. The Contact-Sports Exception.
A. Development of the Contact-Sports Exception. Prior to 1975, plaintiffs were generally allowed to recover in sports injury cases based on a showing of ordinary negligence. See Crawn v. Campo, 266 N. J.Super. 599, 630 A.2d 368, 370-71 (1993). The first noteworthy case to depart from the traditional application of negligence law to sports-injury cases was the Illinois case of Nabozny v. Barnhill, 31 Ill.App.3d 212, 334 N.E.2d 258 (1975). In Nabozny, the court introduced an innovation into the law, namely, that the ordinary rules of negligence do not generally apply in the context of contact sports, including soccer. Nabozny, 334 N.E.2d at 260-61. Instead, sports injuries are only actionable if they are the result of reckless or intentional conduct. Id. The Nabozny court offered several policy reasons for this deviation. The court cited the need “to control a new field of personal injury litigation.” Id. at 261. The Nabozny court also asserted “that the law should not place unreasonable burdens on the free and vigorous participation in sports by our youth.” Id. at 260.
Since Nabozny, the question of whether to alter the application of traditional negligence in sports-injury cases has not been decided in many jurisdictions. See generally Matthew G. Cole, No Blood No Foul: The Standard of Care in Texas Owed by Participants to One Another in Athletic Contests, 59 Baylor L.Rev. 435, 443-57 (2007) (cataloguing status of the contact-sports exception in all fifty states). In those that have, a majority of courts have departed from traditional precedents and developed a common law innovation that has been labeled as the “contact-sports exception” to ordinary rules of tort liability. See, e.g., Knight v. Jewett, 3 Cal.4th 296, 11 Cal.Rptr.2d 2, 834 P.2d 696, 711 (1992); Jaworski v. Kieman, 241 Conn. 399, 696 A.2d 332, 337 (1997); Pfister v. Shusta, 167 Ill.2d 417, 212 Ill.Dec. 668, 657 N.E.2d 1013, 1017-18 (1995).
The courts adopting the contact-sports exception have often cited the policy concerns of Nabozny, namely, that immunity for negligent conduct is essential to ensure vigorous competition and to impede the filing of lawsuits over sports injuries. Knight, 11 Cal.Rptr.2d 2, 834 P.2d at 710; Jaworski, 696 A.2d at 337; Pfister, 212 Ill.Dec. 668, 657 N.E.2d at 1018. Further, the cases suggest that application of the ordinary standard of care could alter the way in which the game is played and require integral parts of sports to be abandoned. Knight, 11 Cal.Rptr.2d 2, 834 P.2d at 710.
The doctrine employed to avoid these untoward consequences is usually assumption of risk. It is claimed the normal expectations of participants in contact sports include the potential for injuries, participants assume the risk of injuries, and therefore there should be no negligence liability for such injuries. See Jaworski, 696 A.2d at 336-37; Pfister, 212 Ill.Dec. 668, 657 N.E.2d at 1017-18.
*87 While most courts that have considered the matter have adopted the contact-sports exception, a minority have rejected it. A leading minority case is Lestina v. West Bend Mutual Insurance Co., 176 Wis.2d 901, 501 N.W.2d 28 (1993), superseded by statute, Wis. Stat. § 895.525(4m) (1995), as recognized in Noffke ex rel. Swenson v. Bakke, 308 Wis.2d 410, 748 N.W.2d 195 (2008). In Lestina, the Wisconsin Supreme Court considered whether to apply an ordinary negligence standard in an action arising out of injuries suffered in a soccer game. Lestina, 501 N.W.2d at 29. In rejecting the contact-sports exception, the Lestina court emphasized that the proponents of the contact-sports exception failed to realize negligence is a flexible standard that is adaptable to a wide range of conduct. Id. at 33. According to the Lestina court:
The very fact that an injury is sustained during the course of a game in which the participants voluntarily engaged and in which the likelihood of bodily contact and injury could reasonably be foreseen materially affects the manner in which each player’s conduct is to be evaluated under the negligence standard.
Id. As a result, the Lestina court found that the negligence doctrine was sufficiently flexible to permit “vigorous competition” and to give adequate1 consideration to other factors cited in support of the contact-sports exception. Id.
The New Hampshire Supreme Court in Allen v. Dover Co-Recreational Softball League, 148 N.H. 407, 807 A.2d 1274 (2002), came to a similar conclusion. In Allen, the court considered whether the plaintiff could recover under a negligence theory for injuries resulting from an er-rantly thrown softball. Allen, 807 A.2d at 1283. Citing Lestina, the court rejected the reckless standard of the contact-sports exception. Id. at 1284. The court noted that in ordinary negligence cases, “a participant ... ‘who creates only risks that are normal or ordinary to the sport acts as a reasonable person of ordinary prudence under the circumstances.’ ” Id. at 1284 (quoting Crawn, 630 A.2d at 373). A participant acts in an unreasonable manner only when the participant increases or creates a risk outside the range of risks that flow from participation in the sport. Id. at 1285.
Another case that rejects the contact-sports exception is Auckenthaler v. Grund-meyer, 110 Nev. 682, 877 P.2d 1039 (1994). In this case, the Nevada Supreme Court considered whether a horse rider could bring a negligence claim to recover for injuries sustained from a kick from another rider’s horse. Auckenthaler, 877 P.2d at 1040. As in Lestina, the Auckenthaler court emphasized the flexibility of the negligence standard. Id. at 1043. The court also, however, noted that the contact-sports exception was “merely another way of recognizing implied assumption of risk through the back door or by way of duty/ risk principles.” Id. at 1044. The Auck-enthaler court noted that Nevada’s comparative fault statute abolished assumption of risk and left no room for the special rule. Id. Finally, the Auckenthaler court observed that the claims regarding the flood of litigation and the chilling effect upon participation in recreational activities “seem overstated.” Id. The court found very few cases where plaintiffs had recovered based upon ordinary negligence in sporting contexts. Id.
B. Application of the Contact-Sports Exception to Softball. There are several cases that consider whether softball should be considered a contact sport for the purposes of any exception to ordinary negligence law. In the majority of cases, courts have held that softball was a contact *88 sport, albeit in highly conelusory language. See Blancher v. Metro. Dade County, 436 So.2d 1077, 1079 (Fla.Dist.Ct.App.1983); Landrum v. Gonzalez, 267 Ill.App.3d 942, 196 Ill.Dec. 165, 629 N.E.2d 710, 714-15 (1994). Softball, however, was not found to be a contact sport in Cahill v. Carella, 43 Conn.Supp. 168, 648 A.2d 169 (1994). In Cahill, the court noted that while some contact will occasionally and accidentally occur in recreational softball games, softball is not a contact sport. Cahill, 648 A.2d at 173.
C. Scope of the Contact-Sports Exception. Some of the cases dealing with the contact-sports exception contain broad, unqualified statements that recovery for injuries suffered in the course of contact sports requires a showing of recklessness. However, in a number of cases that have adopted the contact-sports exception, there have been some clearly drawn limitations on the doctrine.
Limitations to the contact-sports exception finds support in a relatively early case regarding assumption of risk. As stated by Chief Justice Cardozo, a party who engages in a sporting activity “accepts the dangers that inhere in it so far as they are obvious and necessary. ” Murphy v. Steeplechase Amusement Co., 250 N.Y. 479, 166 N.E. 173, 174 (1929) (emphasis added). The limitation of assumption of risk to “obvious and necessary” risks has been carried forward in sports cases. For instance, in the frequently cited case of Turcotte v. Fell, 68 N.Y.2d 432, 510 N.Y.S.2d 49, 502 N.E.2d 964 (1986), the court noted that the contact-sport exception applies only to risks “that are known, apparent or reasonably foreseeable.” Turcotte, 510 N.Y.S.2d 49, 502 N.E.2d at 967. And, as the California Supreme Court has repeatedly emphasized: “[Defendants generally do not have a duty to protect the plaintiff from the risks inherent in the sport, or to eliminate risk from the sport.... [T]hey generally do have a duty [however] not to increase the risk of harm beyond what is inherent in the sport.” Kahn v. E. Side Union High Sch. Dist., 31 Cal.4th 990, 4 Cal.Rptr.3d 103, 75 P.3d 30, 38 (2003).
D. Developments in Tort Law Following Adoption of the Contact-Sports Exception. Since the advent of the contact-sports exception, there have been significant developments in tort law. One such development is the adoption of the Restatement (Third) of Torts. The Restatement (Third) of Torts provides that “[a]n actor ordinarily has a duty to exercise reasonable care when the actor’s conduct creates a risk of physical harm.” Restatement (Third) of Torts: Liab. for Physical and Emotional Harm § 7(a), at 77 (2010). The Restatement (Third) of Torts, moreover, has an overarching philosophy, namely, that the duty of care owed by one to another in matters involving personal safety is ordinarily the generally-applicable negligence standard and that the question of whether that generally-applicable standard has been breached is a factual question for the jury. See id. at § 6 cmt. f, at 69, § 7 cmt. q, at 77-78. The Restatement (Third) of Torts eschews special judge-made rules that apply in narrow situations as incoherent and inconsistent with the overarching architecture of our modern tort law. See also Yount v. Johnson, 121 N.M. 585, 915 P.2d 341, 342 (1996) (noting the law has “moved forcefully towards a public policy that defines duty under a universal standard of ordinary care, a standard which holds all citizens accountable for the reasonableness of their actions [and] away from judicially declared immunity or protectionism, whether of a special class, group, or activity”).
That said, section 7 of the Restatement (Third) of Torts does reserve special duty *89 rules for “exceptional cases.” Restatement (Third) of Torts: Liab. for Physical and Emotional Harm § 7(b) (2010). Section 7(b) provides, “In exceptional cases ... a court may decide that the defendant has no duty or that the ordinary duty of reasonable care requires modification.” Id. And, while implied assumption of risk is disapproved in section 2 of the Restatement (Third) of Torts: Apportionment of Liability, comment j expressly declines to take a position on the application of limited duty in sports cases. Restatement (Third) of Torts: Apportionment of Liability § 2, cmts. % j, at 21-22 (2000).
E. Iowa Case Law Regarding the Contact-Sports Exception. This court in a per curiam opinion in Leonard ex rel. Meyer v. Behrens, 601 N.W.2d 76, 80-81 (Iowa 1999), embraced without discussion the contact-sports exception in the context of a game of paintball. In Behrens, the very purpose of the sport, paintball, involved shooting other participants with projectiles. Behrens, 601 N.W.2d at 77-78. Because of the contact inherent in the activity, the court determined that a special rule of liability requiring recklessness was applicable. Id. at 80-81.
The court cited Dudley v. William Penn College, 219 N.W.2d 484 (Iowa 1974), in support. Behrens, 601 N.W.2d at 79. Dudley, however, involved a failure to supervise claim against a coach and college brought by a player who was hit by a foul ball while sitting in an unprotected dugout. Dudley, 219 N.W.2d at 486. In Dudley, the court affirmed a directed verdict for lack of causal connection, noting, in passing, “Most injuries in athletic contests result from the rough and tumble of the game itself.” Id. at 486.
Next, the Behrens court briefly cited but did not analyze sports cases. Behrens, 601 N.W.2d at 79-81. It relied upon the language in Jaworski for the twin propositions that if negligence were the standard in coparticipant-athletic-injury cases, vigorous play would be affected and there would be a flood of litigation. Id. at 80. And so, the social policies of promoting vigorous competition and avoiding lawsuits in the sport of paintball demanded that, as a matter of law, unreasonable conduct proximately causing serious eye injuries was immune from liability. Id. at 81.
III. Application of Principles.
A. Analysis of the Underpinnings of the Contact-Sports Exception. This court adopted the Restatement (Third) of Torts in Thompson. Thompson v. Kaczinski 774 N.W.2d 829, 835 (Iowa 2009). While the Restatement (Third) of Torts applies a duty of care, it does allow for specific public policy exceptions to the generally-applicable standard of care. Restatement (Third) of Torts: Liab. for Physical and Emotional Harm § 7(b) (2010). Generally speaking, the public policy supporting an exception must be compelling. Id. Otherwise, our tort law will be a minefield of formalistic and incoherent doctrine. Like the per curiam decision in Behrens, the majority does not adequately discuss the policy basis for such an exception for contact sports. I am fearful that under the approach of the majority, the ground work has been laid for a series of judge-made exceptions, which if unabated could create a hodgepodge of our tort law. As I see it, because of the lack of strong policy reasons, the adoption of a reduced standard of care in contact sports is simply another way of recognizing implied assumption of risk through the back door of duty principles. Auckenthaler, 877 P.2d at 1044. The public policy rationale behind the contact-sports exception has no sound basis for a number of reasons.
First, the contact-sports cases generally do not adequately take into consideration *90 the flexibility of negligence as a cause of action. In order for a defendant to be found negligent, the defendant’s acts or omissions must be found to be unreasonable under all the facts and circumstances of the particular ease. As emphasized in Lestina and Allen, a key fact and circumstance of a sports-injury case is the competitive environment in which it occurs. Allen, 807 A.2d at 1285; Lestina, 501 N.W.2d at 33. In applying ordinary negligence standards, the fact that a defendant was engaged in a competitive sport that involved direct physical contact would be a critical and often an outcome-determining factor on the issue of negligence. Conduct that would be a tort on Eighth and Main is perfectly acceptable on the football field. Thus, even the sports cases applying the negligence standard generally would be consistent with the observation in Dudley, namely, that “[m]ost injuries in athletic contests result from the rough and tumble of the game itself.” Dudley, 219 N.W.2d at 486.
As a result, sports injuries that occur in the ordinary course of a contact sport would not give rise to negligence claims. As noted in Allen, it would be part of the ordinary course of reasonable play for a player to throw a ball in an errant direction in a softball game. Allen, 807 A.2d at 1286. Such an act, absent aggravating factors that increase the ordinary risk of the game, would not amount to negligence. Id.; see also McGee v. Bd. of Educ., 16 A.D.2d 99, 226 N.Y.S.2d 329, 331-32 (App.Div.1962) (“Players ... must accept the risks to which their roles expose them. Of course, this is not to say that actionable negligence can never be committed on a playing field. Considering the skill of the players, the rules and nature of the particular game, and risks which normally attend it, a participant’s conduct may amount to such careless disregard for the safety of others as to create risks not fairly assumed.”). Only when a defendant acts unreasonably in light of the goals and purposes of the game, including vigorous competition, would a cause of action arise. See 4 Fowler V. Harper et al., The Law of Torts § 21.5, at 239-40 & n. 17 (2d ed.1986) (criticizing the contact-sport exception on ground that, properly understood, ordinary negligence provides the appropriate framework for sports cases).
Second, the contact-sports exception does not adequately take into consideration our comparative-fault framework. In Iowa, comparative fault has abolished assumption of risk, one of the main underpinnings of the contact-sports exception. Iowa Code § 668.1(1) (2005). The legislature has not crafted an exception for contact sports. In many cases, assumption of risk provides the analytical framework for special rules for sports participants. In Iowa, a special duty rule cannot be fashioned based on this type of assumption of risk. The majority seems to anticipate what the legislature should have done, or perhaps will do, namely, craft an exception to comparative fault, rather than rely upon what the current law provides.
Third, I question whether “the sky is falling” approach of the contact-sports cases bears any reasonable relationship to reality. For example, in Jaworski, the Connecticut Supreme Court declared:
If simple negligence were adopted as the standard of care, every punter with whom contact is made, every midfielder high sticked, every basketball player fouled, every batter struck by a pitch, and every hockey player tripped would have the ingredients for a lawsuit if injury resulted.
Jaworski, 696 A.2d at 338. Such quotable language has been cited slinky-style in a string of case law that includes Behrens, but has no factual basis.
*91 For example, prior to 1975, before the development of the contact-sports exception, there is no evidence that sports competition was being suppressed by negligence law. The players in the historic Army-Navy games, or those who participated in state basketball tournaments in that golden era, would be stunned to learn that the members of this court sitting in our conference room thirty-five years later have concluded that their participation in these events was less vigorous because of their concern about the prevailing tort law. Furthermore, it would be preposterous to believe that after the Lestina decision of the Wisconsin Supreme Court in 1993, Iowa athletic teams who traveled to Wisconsin for away games played differently than they did at home, or in Wisconsin in the years prior to the decision. Similarly, in jurisdictions like Nevada and Arizona, where sports teams have achieved national prominence, there is no evidence that vigorous competition has been impacted by appellate court decisions that have explicitly rejected the contact-sports exception. Further, no one seriously claims that athletic competition over recent decades is less vigorous in the many states where there is no authority one way or the other on the contact-sports exception.
After over four decades of experimentation with the special rule in some states, no special rule in other states, and uncertainty in many states, one would think the states as laboratories of democracy would have produced some evidence to support the speculation of courts regarding “vigorous competition.” The lack of evidence over this prolonged period of time is a powerful indicator that the vigorous competition policy rationale of the contact-sports exception has no basis in fact.
In any event, one might wonder, in today’s world, whether vigorous competition needs the “breathing room” provided by a recklessness standard. As noted in one leading sports law text, “the evidence is accumulating that, on every level of competition, participants need to be restrained and not emboldened.” See Ray Yasser et al., Sports Law: Cases and Materials 720 (4th ed.2000). To the extent tort rules would affect behavior in the context of athletics, the elimination of the contact-sports exception would promote a sense of restraint, a sense that the game has to be played within the rules, a sense of respect for the bodily integrity and person of the opposing player. There is a word that encompasses these traits — sportsmanship. I am old-fashioned enough to want our tort system to give this traditional value contemporary life.
Fourth, the bogeyman of an “avalanche of lawsuits,” that reliable and hoary chestnut that is relied upon whenever there is potential liability, has no more validity in the sports context than in most contexts in which it is applied. The majority of cases upon which it relies cite no evidence of an avalanche of lawsuits in states that have rejected or have not yet embraced the contact-sports exception. Indeed, in Iowa, there was no reported case involving co-participants in sports until the court considered the exotic sport of paintball in Behrens in 1999. In short, not one case involving coparticipants in football, basketball, baseball, softball, or soccer came to this court for resolution prior to 1999. There was no threatened “avalanche of litigation” in Iowa, then or since.
Indeed, the leading case with the inflated rhetoric about the potential “avalanche of litigation” comes from the Connecticut Supreme Court in Jaworski. Mark M. Rembish, Liability for Personal Injuries Sustained in Sporting Events After Jaworski v. Kiernan, 18 Quinnipiac L.Rev. 307, 337-38 (1998). Yet in the fifty-five-year period from 1941, when the Connecti *92 cut Supreme Court held that negligence was the standard in sports cases, until 1997, when Jaworski announced its contact-sports exception, the reported cases in Connecticut involving coparticipants in sports cases amounted to the grand total of two! Id. at 338.
In any event, even if there were a semblance of reality to the myth of a litigation avalanche, adoption of the contact-sports exception is just as likely to increase litigation as it is to diminish it. Here is the argument: advocates of the contact-sports exception believe that it will encourage robust and vigorous play; the more robust and vigorous the play, the more injuries are likely to occur; and the more injuries that occur, the more litigation results. See Thomas F. Miller, Torts and Sports: Has Michigan Joined the Wrong Team with Ritchie-Gamester, 48 Wayne L.Rev. 113, 131 (2002). I do not claim to have empirical evidence to support this line of reasoning, but it is just as likely to be correct as any opposite conclusion.
I further question the underlying premise of the “avalanche of litigation” theory. First, it reaches too far. If the “avalanche of litigation” theory were a driving principle of tort law, it would have more application in the world of airplanes and automobiles than competitive sports. Second, it is just wrong. The tort system exists to compensate persons who are injured by the unreasonable conduct of others.
It may be, I suppose, that there is an unarticulated reason behind the “avalanche of litigation” theory, namely, a mistrust of juries to do the right thing. Yet, we trust juries to do the fact finding in complicated matters ranging from medical malpractice to business tort cases. If juries can handle these types of cases, they can surely be trusted with cases arising from competitive sports injuries.
Fifth, assuming that the application of ordinary negligence would have some mild deterrent effect on play and produce a few additional lawsuits, this would not be an untoward development. The cases that embrace the contact-sports exception generally note that there must be a balance between the interests of promoting vigorous participation in sports and the safety of participants. See Ross v. Clouser, 637 S.W.2d 11, 14 (Mo.1982). In the last three or four decades, there is one empirical fact that the majority ignores and no knowledgeable person challenges — there has been an epidemic of sports injuries among children. See Griffin Toronjo Pivateau, Tackling the Competitive Sports Doctrine: A New Proposal for Sports Injuries in Texas, 9 Tex. Rev. Ent. & Sports L. 85, 88 nn. 8-9 (2007) (citing statistics from the U.S. Consumer Products Safety Commission and the National Center for Injury Prevention and Control showing substantial increase in sports injuries in recent years).
The increase in injuries in contact sports has had a number of adverse effects. For those injured due to unreasonable conduct, the adverse effects are self-evident. Further, however, the increasingly dangerous nature of competitive sports has tendencies to deter participation by those who might be willing to play but who do not wish to be exposed to the risk of injuries from unreasonable conduct. For those who wish to promote broadly the values of athletics across the culture, the contact-sports exception may be self-defeating. If it is true that application of the negligence doctrine would modestly deter unreasonable conduct, the time has come to tip the balance in the direction of safety and potentially broader participation.
For the above reasons, I question whether the contact-sports exception has a *93 sound foundation in fact or law in today’s sports world.
B. Softball as a Contact Sport. Because of my concerns regarding the validity of the contact-sports exception generally, I have no interest in seeing it expanded outside the limited context of Behrens, which emphasizes that the very purpose of the sport is to strike an opposing player. Behrens, 601 N.W.2d at 77-78. As a result, I would conclude that softball is outside the scope of Behrens and is not a contact sport for purposes of the rule. The primary purpose of softball does not involve clashing bodies like that of football or rugby. There is no doubt that, on relatively rare occasions, a participant in a softball game may be injured by an errant throw of a ball or a bat. Hitting participants with balls and bats, however, is not the purpose of the sport. There is, of course, incidental contact, but there is occasional incidental contact in golf (thrown clubs and misdirected shots), ping-pong (flying mallets and spinning balls to the eye), and the racing of toads (participants bumping into one another as they urge their champions to victory). There are ordinarily no immunities for injuries arising from these types of incidental contact, and I would not apply them to the game of softball.
Aside from my policy concerns, I also have technical concerns with developing some kind of imprecise and irrelevant category of “contact” vs. “noncontact” sport. It is a meaningless exercise. This is the kind of pointless labeling that we recently rejected in Koenig. See generally Koenig v. Koenig, 766 N.W.2d 635, 643-45 (Iowa 2009) (abolishing the distinction between invitees and licensees in premises liability). Instead of some kind of grand categorization of sports, the better approach, even if one were to embrace the immunity rule sought by the majority, is not to divide sports into categories, but instead look at the fundamental nature of any competitive sport and determine whether the injury was the result of an inherent risk of the game, i.e., a risk that is part and parcel of the activity and necessary if the game is to be played at all. If the answer is yes, then a special duty rule might apply. If the answer is no, then ordinary negligence applies.
It makes no sense at all to adopt the blunt and imprecise categorization approach that has the potential of being both overbroad and underinclusive. I, of course, doubt that the court would be willing to extend the contact-sports exception to sports like golf, table tennis, and the racing of toads, but this is an argument against the rule in the first place.
Further, not all “softball” is the same. An informal game of softball involving children and adults may operate by one set of rules and generate gentle expectations, while a highly competitive game involving adults played for high stakes may involve more risk of physical contact. In this case, there is no elaboration in the record other than the game was a slow-pitch softball game involving seventeen year olds playing in an organized league. These facts alone, in my view, are not sufficient to declare that this softball game was a “contact sport.”
In any event, if forced to make a choice in a bipolar world, I would conclude that softball is not a contact sport. Unlike football or paintball, for example, the very purpose of the game does not involve the collision of bodies or projectiles. I do not believe the nature of the game of softball will be dramatically changed by a rule imposing liability for negligence under all the facts and circumstances. I would, therefore, not apply any special immunity to the game.
*94 C. Scope of the Contact-Sports Exception. Even if the court decides to embrace the contact-sports exception and even if softball is declared by verbal bludgeon to be a contact sport, it is clear even from the case law upon which the majority relies that this is not the end of the matter. The immunities of any special rule that the majority adopts plainly do not extend to every occasion when a participant is injured.
In my view, under the better-reasoned contact-sports cases, a person who commits acts or omissions that create risks that are outside the ordinary risks inherent in a game are subject to liability sounding in negligence. Such acts or omissions “increase the risk of harm beyond what is inherent in the sport.” Kahn, 4 Cal.Rptr.3d 103, 75 P.3d at 38. The proper standard of liability in these situations is ordinary negligence, not recklessness. See Phi Delta Theta Co. v. Moore, 10 S.W.3d 658, 662-63 (Tex.1999) (Enoch, J., dissenting).
Here, the plaintiff is entitled to assert that the throwing of the bat by this right-handed hitter behind his back all the way down to the first baseman with its resultant injuries was not an inherent and inevitable part of the game but was outside the risks associated with the activity. An expert testified that in thirty years of coaching softball, he had never seen this kind of incident. As a result, there is a factual question regarding whether the acts of the defendant fell outside the scope of the contact-sports exception and therefore triable as an ordinary negligence action.
IV. Conclusion.
In light of the underlying weakness in the contact-sports rationale, I would not permit it to drift outside its moorings. As a result, I would not extend the contact-sports exception to an amateur game of softball. At a minimum, whether the contact-sports exception applies involves a careful consideration of the facts and circumstances.
Even assuming the contact-sports exception applies to the game involved in this case, the rule does not immunize negligent conduct that is outside the inherent risk of the activity. In this case, at a minimum, the plaintiff is entitled to argue that the conduct involved — the throwing of a bat by a right-handed batter who twirls around and throws the bat with sufficient force to strike the first baseman, what was indisputably an extraordinary and unheard of event — presents a danger that was outside the inherent risk of the game and, as a result, subjects the actor to liability based on ordinary negligence.
WIGGINS, J., joins divisions I and 111(A) of this special concurrence and HECHT, J., joins this special concurrence in its entirety.